(b)  In the event any individual member of the group shall, during the term hereof, cease to be an actively performing member of the group (any such individual being hereinafter sometimes referred to as a "Leaving Member"), you shall promptly give us written notice thereof by certified or registered mail, return receipt requested.  You shall, at our election, designate a replacement member for such Leaving Member and we shall have the right to approve any such replacement member, which approval we shall not unreasonably withhold, provided such replacement member shall be bound by all of the terms and provisions of this contract as if such individual were an original member of the group.  You shall, upon our request, cause such individual to execute and deliver to us such documents as we may deem necessary or expedient to evidence such individual's agreement to be so bound, including, without limitation, a letter of inducement and adherence substantially similar to the letter of inducement and adherence the current members of the group shall execute concurrently herewith.  Pending such individual's execution and delivery to us of any such documents, we shall have no obligation to pay you any amounts which would otherwise be payable to you hereunder.

(c)  In addition to the rights provided in (b) above, we shall have the irrevocable option to cause you to furnish to us the exclusive recording services of any Leaving Member.  Such option may be exercised by us by written notice given to you at your address hereunder no later than ninety (90) days after the date upon which we shall have received the written notice required to be served by you pursuant to subparagraph (b).  If we shall so exercise such option with respect to any such Leaving Member, you will be deemed to have executed a production contract with us pursuant to which you agree to furnish the exclusive recording services of such Leaving Member to us on the same terms and provisions as are specified herein with respect to the Artist, except as hereinafter provided:

(i)  the term of our production contract with you with respect to such Leaving Member shall be for an initial term of one (1) year, commencing as of the date of our written notice to you pursuant to subparagraph (c)

28.

Whsp. 00055

above, and we shall have such number of separate irrevocable options as equal the number of years in the term of this contract or any extensions or renewals thereof, as of the date such individual shall have become a Leaving Member, but in no event shall the number of options be less than three (3). Each option shall give us the right to renew such term for one (1) year. Such renewal terms shall run consecutively beginning at the expiration of such initial term, all upon the same terms and provisions applicable to such initial term. Each such renewal option may be exercised only by our giving you written notice (at your address hereunder) at least thirty (30) days prior to the commencement of the renewal term for which such renewal option is exercised;

(ii)   During the initial term you shall produce and deliver to us, at a minimum, two (2) master recordings embodying the performances of such Leaving Member, plus, at our election, additional master recordings embodying his performances, provided, however, we shall have no right to require you to produce and deliver in excess of two (2) LP's during the initial term;

(iii)   During each renewal term, if any, you shall produce and deliver to us, at a minimum, master recordings embodying the performances of such Leaving Member sufficient to constitute one (1) LP, plus, at our election, additional Master recordings embodying his performances, provided, however, we shall have no right to require you to produce and deliver in excess of two (2) LP's during any such renewal term;

(iv)   The royalty rates pursuant to paragraphs 6(a)(i) and 6(b)(i) hereof with respect to such Leaving Member shall be Ten percent (10%); the royalty rate pursuant to paragraph 6(b)(iii) hereof with respect to such Leaving Member shall be Eight percent (8%); and the royalty rates pursuant to paragraphs 6(b)(ii) and 6(b)(iii) hereof with respect to such Leaving Member shall be Six percent (6%); and,

(v)   The advance payable from us to you pursuant to paragraph 25(c) shall not be applicable. However, in respect of each LP embodying the performances of such Leaving Member, we shall pay to you an advance, fully recoupable by us from any and all royalties payable to you hereunder, in an amount of One Hundred Twenty-Five Thousand Dollars ($125,000): one half (1/2) of which shall be payable upon commencement of recording sessions for the Masters required to be delivered to us and one half (1/2) of which shall be paid upon your delivery to us of the Masters.  With respect to recording sessions for fewer Masters than sufficient to constitute one (1) LP, the applicable advance shall be a fraction of $125,000, the numerator of which is the number of Masters requested and the denominator of which is ten (10);

Whsp. 00056

(vi) We shall be entitled to maintain a single account with respect to recordings subject to this contract and recordings subject to such agreement with you in respect of such Leaving Member(s) and shall have the right to recoup from any royalties payable under this paragraph any unrecouped advances and charges under this contract; and,

(vii) The Masters embodying the performances of such Leaving Member(s) which you produce and deliver to us shall not be applied in diminution of your minimum recording commitment with respect to Masters embodying the performances of the Artist as set forth herein.

At our request, you shall cause any such Leaving Member to execute and deliver to us any and all documents as we may deem necessary or expedient to evidence the foregoing, including, without limitation, a letter of inducement and adherence to us relating to his recording services.

(d) Notwithstanding any of the foregoing, in the event any member of the group shall be a Leaving Member or in the event the group shall completely disband, we shall have the right, at our election, in addition to all of our other rights or remedies which we may have in such event, to terminate this contract by written notice to you and shall thereby be relieved of any and all obligations hereunder except our obligations with respect to Masters recorded hereunder prior to such termination. In the event we elect to so terminate this contract, subparagraph (c) above shall be deemed applicable to each member of the group as if each such member were a Leaving Member.

(e) You hereby warrant, represent, and agree that:

(i) you solely and exclusively own or control all rights in and to the professional name "The Whispers (hereinafter referred to as the "Group Name"), including, without limitation, the right to utilize and to permit others to utilize the Group Name for purposes of trade, and otherwise without restriction, in connection with the master recordings recorded by the Artist hereunder, the phonograph records derived therefrom, and our record business.

(ii) during the term hereof, the Group Name shall not be changed without our prior written consent.

(f) In the event any member of the group shall become a Leaving Member but we do not exercise any option as provided in this paragraph with respect to such Leaving Member, such Leaving Member shall not have the right thereafter during the term hereof to use any professional name utilized by the group (including, without limitation, the Group Name) or any name similar thereto, or to prevent, prohibit, or interfere with our, your, and the Artist's use of the Group Name or any other professional name utilized by the Artist.

30.

23. (a) We shall, provided you are not at any time in breach of this contract, or any part hereof, release in the United States during the initial term and during the renewal term, if any, each LP embodying the performances of the Artist which is produced and delivered by you hereunder, within One Hundred Twenty (120) days after your delivery to us of any such LP, provided that we shall have available at the times required by us a sufficient number of newly recorded satisfactory Masters, produced and recorded in all respects in accordance with the terms and provisions hereof, to enable us to satisfy such release commitment.

(b) In the event that during the initial term or any renewal term hereof we shall fail to release in the United States any such LP pursuant to the provisions of this paragraph, your sole remedy shall be to notify us in writing, by certified or registered mail, return receipt requested, of such failure within fifteen (15) days after the end of such term, One Hundred Twenty (120) day period, and of your desire that this contract be terminated if we do not, within Ninety (90) days after our receipt of such notice from you, release in the United States such required minimum number of records. In the event we shall effect such release within such Ninety (90) day period, we shall be deemed to have released such required minimum number of records during the aforementioned One Hundred Twenty (120) day period. In the event we shall fail to effect such release within such Ninety (90) day period, we shall have no liability whatsoever to you in connection therewith, and this contract shall terminate as of the end of such Ninety (90) day period.

24. Notwithstanding anything to the contrary contained herein:

(a) (i) in the event the aggregate net sales through normal distribution channels in the United States of any particular LP (including disc and tape), computed separately LP by LP, embodying only newly recorded Masters hereunder shall exceed five hundred thousand (500,000) units, then the royalty rate pursuant to paragraph 6(a)(i) hereof shall be increased to Thirteen and One-Half percent (13-1/2%) only with respect to net sales through normal distribution channels in the United States of such LP in excess of five hundred thousand (500,000) units, but not in excess of one million (1,000,000) units; and

(ii) in the event the aggregate net sales through normal distribution channels in the United States of any particular LP (including disc and tape), computed separately LP by LP, embodying only newly recorded Masters hereunder shall exceed one million (1,000,000) units, then the royalty rate pursuant to paragraph 6(a)(i) hereof shall be increased to Fourteen percent (14%) only with respect to net sales through normal distribution channels in the United States of such LP in excess of one million (1,000,000) units.

31.

(b) An increase in the royalty rate pursuant to paragraph 6(a)(i) hereof by reason of the foregoing provisions of this paragraph shall not result in the increase in any other royalty rates contained in paragraph 6. Accordingly, and without limiting the generality of the foregoing, for the purpose of computing any royalty rates pursuant to paragraph 6 which are based on the royalty rate contained in paragraph 6(a)(i), the provisions of this paragraph shall be disregarded.

25. Conditioned upon your full and faithful performance of all of the material terms and provisions hereof, we shall pay to you the following sums, at the times and on the conditions hereinafter set forth:

(a) Promptly following the execution hereof, One Hundred Fifty Thousand Dollars (S150,000) which shall be deemed a non-returnable and non-recoupable advance:

(b) Promptly following the execution hereof, Seven Hundred Thousand Dollars (S700,000) which shall be deemed a non-returnable advance, fully recoupable by us from any and all royalties by us to you hereunder.

(c) We shall pay you, at the times and in the amounts indicated below, advances in respect of each of the LP's embodying Artist's performances to be produced and delivered by you during the initial term hereof:

(i) Upon commencement of recording sessions for each LP embodying Artist's performances required to be produced and delivered by you during the initial, term hereof, we shall pay you Eighty Seven Thousand Five Hundred Dollars (S87,500) with respect to each such LP:

(ii) Promptly following your delivery to us of satisfactory Masters embodying Artist's performances sufficient to constitute each LP required to be produced and delivered by you during the initial term hereof, we shall pay you Eighty Seven Thousand Five Hundred Dollars (S87,500) with respect to each such LP, so long as you shall have delivered to us copies of fully completed union contract and report formswith respect to each such LP:

(iii) Any amounts paid pursuant to this paragraph 25(c) shall be advances, fully recoupable by us from any and all royalties payable to you hereunder.

(d) We shall pay you, at the times and in the amounts indicated below, advances in respect of each of the LP's embodying Artist's performances to be produced and delivered by you during the renewal term hereof:

(i)   Upon commencement of recording
sessions for each LP embodying Artist's performances
required to be produced and delivered by you to us during
the renewal term hereof, we shall pay you One Hundred
Seventy Five Thousand Dollars ($175,000) with respect to
each such LP;

(ii)   Promptly following your delivery
to us of satisfactory Masters embodying Artist's performances
sufficient to constitute each LP required to be produced and
delivered by you during the renewal term hereof, we shall pay
you One Hundred Seventy Five Thousand Dollars ($175,000) with
respect to each such LP, so long as you shall have delivered
to us copies of fully completed union contract and report
forms with respect to each such LP;

(iii)   Any amounts paid pursuant to this
paragraph 25(d) shall be advances, fully recoupable by us
from any and all royalties payable to you hereunder.

26.   At any time during the term hereof, we shall
have the right to purchase, at our sole expense, any life,
disability, or health insurance policy or policies naming
Artist and/or any member thereof and/or any Leaving Member
hereunder, as the named insured.  We shall have the
unfettered right to select any insurance policy, the
beneficiaries thereof, and any terms thereof, including,
but not limited to, the type of policy and the amount and
issuer thereof, and we shall retain complete control over
the administration of such policy.  You shall cooperate
fully with us and shall cause Artist to cooperate fully with us
(as is more fully set forth in the following sentence hereof) in
obtaining such policy or policies. You shall take whatever
actions are required by the insurance company providing any such
policy or whatever actions are necessary in order for us to
obtain and maintain in effect any such policy, including but not
limited to, at such times as we may request, the submission by
Artist and/or any member thereof and/or any Leaving Member
hereunder, to a thorough and complete physical examination by a
licensed physician and the completion of any and all documents or
information necessary or desirable to us or the applicable
insurance company in connection with any such policy.  You
hereby acknowledge that Artist, any members thereof, and you
shall have no interest whatsoever in any such insurance policy
and, at our request, you shall cause Artist, and any member
thereof, to acknowledge in writing such lack of interest.  In the
event we shall not be able to obtain any such insurance policy on
the life of Artist, and/or any individual member thereof, as the
result of the failure of Artist and/or any individual member
thereof to pass any aforesaid physical examination or to provide
any information required in connection with the application for
or issuance of any such policy, we shall, at any time prior to
the date occurring ninety (90) days after the execution hereof,

33.

                                              Whsp. 00060

have the right to terminate this agreement and in such event you shall, upon our demand, promptly reimburse us for any monies (other than royalties) paid by us hereunder. In the event you shall fail so to reimburse us, we shall, in addition to any other rights and remedies which we may have in such event, have the right to recoup any such monies from any royalties payable by us to you and/or the Artist under this agreement or any other agreement between you and us and/or Artist and us.

27. As a material inducement for us to enter into this contract, you warrant and represent without any condition or qualification whatsoever that the minimum compensation which you will actually pay to each individual comprising the Artist in respect of the services of the Artist to be furnished by you hereunder shall not be less than Six Thousand Dollars ($6,000.00) per annum. In the event you shall fail to do so, we shall have the right to pay the same directly to the Artist, it being understood that any such sums so paid by us to the Artist shall constitute nonreturnable advances recoupable from any and all monies payable to you hereunder, as well as from any amounts payable in respect of the Controlled Compositions pursuant to paragraph 8 hereof. You acknowledge and confirm that your such warranty and representation is intended to preserve the right to seek injunctive relief to prevent the breach of this contract by any individual comprising the Artist, and accordingly it is your and our mutual intention that your warranty and representation be interpreted and construed in such a manner as to comply with the provisions of California Civil Code Section 3423 (Fifth) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services. If California law is hereafter amended to provide for a different minimum compensation requirement than Six Thousand Dollars ($6,000.00) per annum as a requisite for injunctive relief, the aforesaid references to Six Thousand Dollars ($6,000.00) shall automatically be deemed amended to such new figure as of the effective date of such law.

If the foregoing correctly reflects your understanding and agreement with us, please so indicate by signing below.

Very truly yours,

SOLAR RECORDS, INC.

By _____
DICK GRIFFEY, President

AGREED AND ACCEPTED:

THE WHISPERS MUSIC, INC.

BY _____
, President

34.

Whsp. 00061



**SOUND OF
LOS ANGELES RECORDS**

07/02/86:PVB/jls:004

Effective: ~~July    7~~, 1986

Whisper's Music Inc.
~~8033 Sunset Blvd. Ste. 404C~~  ——→ c/o
~~Los Angeles, California  90046C~~  Cooper, Epstein and Hurewitz M.C.
                          9465 Wilshire Blvd. Ste. 900  7-7-1886
Re:  Recording Agreement    Beverly Hills  CA  90212
                          Attn: Phalon G. Hurewitz Esq.
Dear Gentlemen:

The following shall constitute our agreement with respect to your
furnishing the services of Wallace Scott, Walter Scott, Nicholas Caldwell,
Marcus Hutson and Leaveill Degree p/k/a "The Whispers" (hereinafter "The
Whispers") to record for us during the term of this contract, master recordings
embodying their performances (hereinafter sometimes referred to individually
by the term "Master" and collectively by the term "Masters").

1.    The term of this contract shall consist of an initial term commencing
as of the date hereof and continuing for three (3) years and of the additional
renewal terms hereafter provided.  This paragraph shall expressly incorporate
the provisions of Exhibit "A" which is attached hereto.

(a)  The term of the former recording agreement between Sound
of Los Angeles Records Inc. (SOLAR) and The Whispers Music Inc. (WHISPERS) 7-7-86
dated March 19, 1981 shall be terminated as of the date of this agreement.
The aforesaid former agreement will be deemed to have terminated as if the
term had expired so that all executory obligations including but not limited
to rerecording restrictions, obligations to account and pay royalties and the
like shall remain in full force and effect.

2.    (a)    During the initial term hereof, you shall record for us,
sufficient Masters to constitute four (4) 12-inch, 33-1/3 rpm, long-playing
records of no less than thirty-five (35) and of no more than forty (40) minutes
in duration (hereinafter sometimes referred to individually by the term "LP"
and collectively by the term "LP's").  During each renewal term you shall record,
produce and deliver masters sufficient to constitute one album.  The Masters
which you are required to record hereunder are hereinafter sometimes referred
to collectively as "your recording commitment".

(b)    Each Master shall embody your performance as an artist
of the group "The Whispers" of musical compositions previously unrecorded
within the last five (5) years by you and shall be recorded in its entirety at
a recording studio or studios.  Accordingly, but without limiting the generality
of the foregoing, no Masters shall be recorded in whole or in part at live concerts
or other live performances, unless you and we agree otherwise in writing.
Each LP recorded hereunder shall embody no less than eight (8) and no more
than ten (10) musical compositions, unless you and we agree otherwise in writing.
The musical compositions or other selections which shall be embodied in the
Masters, the individual producer of the Masters, and all other individuals rendering
services in connection with the recording of the Masters shall be mutually

Ex. 001-001    Whsp. 00062

selected by us. Each Master shall be subject to our approval and as technically and commercially satisfactory for the manufacture and sale of phonograph records, and upon our request, you shall re-record any musical composition or other selection until a Master technically and commercially satisfactory to us shall have been obtained.

(c)    Recording sessions for the Masters hereunder shall be conducted by us upon dates at such locations as we shall designate. You shall receive reasonable notice of the times and locations of recording sessions conducted for Masters recorded hereunder. All material selected for recording shall be subject to our prior approval. The provisions of this sub-paragraph shall be applicable only if recording sessions are conducted under our recording license. In the event recording sessions are conducted under your recording license then the time and location of recording sessions shall be subject to our mutual approval. Also, all compositions selected for recording shall be mutually approved prior to recording the material.

(d)    Any master recordings which, for any reason within your control or for any reason which could have been avoided by reasonable diligence on your part, are not recorded in all respects in accordance with the terms and provisions hereof shall not, unless we otherwise consent in writing, apply toward the fulfillment of your recording commitment. Furthermore, in the event we shall make any payments in respect of any such master recordings which shall not have been recorded in all respects in accordance with the terms and provisions hereof, for any reason solely within your control or for any reason which could have been avoided by reasonable diligence on your part, you shall, upon our demand, promptly reimburse us for any such payments. In the event you shall fail to so reimburse us, we shall, in addition to all of our other rights or remedies which we may have in such event, have the right to deduct an amount equal to such payments from any royalties payable by us to you hereunder.

3.    (a)    Recording sessions for the Masters may be conducted under our recording license, provided that we give you written notice of our intention to record under our license. No recording sessions shall be commenced hereunder, nor shall any commitments be made or costs incurred in connection therewith, unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been approved in writing by one of our officers. We shall not be responsible for any payments to any individuals rendering services in connection with the recording of the Masters which exceed union scale unless such excess and the proposed recipients thereof are specified in said budget and approved by us. You shall be solely responsible for any such excess payment only in the event those payments were caused by some fault of yours, otherwise the responsibility for any such excess payment shall be equally apportioned among the blameworthy parties. We shall be responsible for any penalties incurred for late payments caused by the Producer(s) of Masters recorded hereunder delay in assisting us in submitting union contract forms, report forms or bills, unless we shall agree to pay said penalties; in which case, they shall be deemed part of the recording costs. We shall pay the recording costs of the Masters recorded at recording sessions conducted hereunder in accordance with the terms and provisions hereof. It is agreed that you shall pay for the cost of the first reference disc for Masters recorded hereunder. It is further agreed that we shall pay for the cost of all subsequent master reference discs

after you satisfactorily deliver the first reference discs of album and/or singles recorded hereunder.

(b)     We shall make all minimum union scale payments required to be made to you in connection with the recording services furnished by you hereunder. All such payments, as well as all payments to any other individuals rendering services in connection with the recording of the Masters, all other payments which are required to be made by us pursuant to any applicable law or regulation or the provision of any collective bargaining agreement between us and any union or guild representing the artist or any such other individuals rendering services in connection with the recording of the Masters, including without limitation, payroll taxes and payments to union pension and welfare funds, all amounts paid or incurred by us for studio or hall rentals, tape, engineering, editing, instrument rental and cartage, transportation, accommodations, immigration clearances and so-called "per diems" in respect of any individuals rendering services in connection with the recording of the Masters, shall be recoupable from royalties earned by you hereunder. It is agreed that payments to union funds which are not based upon payroll, such as the AFofM Music Performance Trust Fund and the Phonograph Record Manufacturers Special Payments Fund shall not be recoupable from royalties earned by you hereunder. It is further agreed that any manufacturing cost associated with the manufacturing of phonograph records derived from Masters recorded hereunder, such as mastering, shall not be recoupable from royalties payable to you hereunder.

(c)     You shall cooperate with us and your Producer to assist in delivering to us a two-track stereo tape for each Master. All original session tapes and any derivatives or reproductions thereof shall also be delivered to us or maintained at a recording studio or other location designated or approved by us, in our name and subject to our control, and we shall own all such tapes, derivatives and reproductions; provided, however, that we shall have no right, without your prior written consent, to exploit, in any manner whatsoever, any "out-takes", rehearsal or other tapes or materials and any derivatives or reproductions thereof which are not delivered to us for the purpose of release or in fulfillment of your recording commitment hereunder.

(d)     Notwithstanding anything to the contrary contained herein, in the event recording sessions for the Masters are conducted under your "The Whispers" recording license, it being understood that recording sessions shall be conducted under your recording license, provided that at no time prior to, or during recording you are in breach of the terms of this agreement, then the provisions of subparagraphs 3(d) through (i) shall apply. You hereby warrant and represent that you shall, prior to the commencement of any recording sessions hereunder obtain and thereafter maintain in good standing a recording license with the American Federation of Musicians ("AFM").

(e)     You hereby warrant, represent and agree that all union contract forms and report forms for recording sessions hereunder and all necessary payroll forms (including, without limitation, all necessary W-4 and other withholding tax forms) pertaining to such recording sessions shall be submitted by you in accordance with all applicable union, governmental or other requirements, and that you shall make all union and payroll payments in a timely manner so as to avoid any penalty for late payment. You shall, within seven (7) days after the completion of each recording session, provide us with copies of such

union contract or report forms or other union forms. Your inadvertent failure so to provide us with such copies shall not constitute a breach of this contract unless you shall not, after our written request therefor, provide us with some copies within three (3) days. You shall be solely responsible for any penalties incurred for late payments caused by your delay in submitting union contract forms, report forms or bills. Any such penalties shall be included as recording costs hereunder.

(f)    You shall be solely responsible for and shall promptly pay when due all recording costs incurred in connection with the production of the Masters hereunder, including without limitation, the recording fees due any Artist in connection with the recording services of such Artist hereunder (including all minimum union scale payments required to be made to such Artist), all advances and other payments required to be made to any individual producer of the Masters, all payments to any other individuals rendering services in connection with the recording of the Masters, all amounts which shall be paid or incurred for studio or hall rentals, tape, engineering, editing, instrument rental and cartage, mastering (which shall not include any part of the mastering process beyond the production of the lacquer master), transportation, accommodations, immigration clearances, and so-called "per diems" in respect of any individuals rendering services in connection with the recording of the Masters (including any individual producer of the Masters and such Artist), and all payments which are required to be made pursuant to any applicable law or regulation or the provisions of any collective bargaining agreement between you or us and any union or guild representing such Artist or any such other individuals rendering services in connection with the recording of the Masters (including without limitiation, payroll taxes and payments to union pension and welfare funds, but excluding any so-called per-record royalty payments payable to the AF of M which shall be paid by us), together with any and all other amounts which shall be paid or incurred in connection with the recording of the Masters.

(g)    In the event that we pay any recording costs hereunder, you shall, upon our written demand made no later than ninety (90) days after such payment, promptly reimburse us for all such payments, after we substantiate that such payments have been made; and in the event that you shall fail to do so or we shall fail to make such demand, we shall, in addition to all other rights and remedies which we may have in such event, have the right to deduct an amount equal to all such payments by us from any monies due or payable by us to you hereunder. Notwithstanding the foregoing, should SOLAR desire to make any payments as described herein, we agree that we will consult with you prior to making any such payment in order to determine whether or not payments should be made.

(h)    (i)    You shall deliver to us a two-track stereo tape, and upon our request, a monaural tape for each Master; we shall have the right to maintain and possess, and to exploit as provided herein, such tapes. You shall maintain and keep such tapes in a first-class condition.

(ii)    You shall have the right to possess and maintain, in our name and at a recording studio of your choice, a copy of each two-track stereo tape ("Safety Tapes"), as well as all "out-takes" rehearsal tapes or extra recordings, or other tapes or records which you do not deliver to us for the purpose of release, but which are produced in connection with recording sessions

07/02/86:PVB/jls:004

hereunder (such tapes, records or master recordings are referred to herein as "Out-takes") and all original session tapes or other multi-track master tapes (including but not limited to any twenty-four (24) track master tapes) of Masters hereunder (hereinafter "Multi-tracks") or any derivatives or reproductions of any of the foregoing; provided, however, you shall not have the right to exploit any Safety Tapes, Out-takes or Multi-tracks in any manner whatsoever, including without limitation, to manufacture, distribute or sell any Safety Tapes, Out-takes, or Multi-tracks, or records derived therefrom. In the event you shall breach the provisions of this paragraph, we shall, in addition to any other rights and remedies available to us, be entitled to seek injunctive relief.

(i)    In the event you shall lose or otherwise fail to maintain in good standing your recording license hereunder or fail to comply with applicable union rules or regulations, we shall have the right to require you to conduct any further recording sessions as we shall designate under our recording license, then, notwithstanding the foregoing provisions of this paragraph, the following terms and conditions shall apply:

(i)    We shall pay all recording costs in connection with the recording and production of such Masters; all such recording costs shall be recoupable or deductible from any monies payable to you hereunder.

(ii)    No recording sessions shall be commenced hereunder nor shall any commitments be made or costs incurred in connection therewith unless and until a proposed recording budget for the Masters to be recorded at such sessions shall have been submitted by you in writing and approved in writing by one of our officers. We shall not be responsible for any payments to any individuals rendering services in connection with the recording of such Masters which exceed union scale unless such excess and the proposed recipients thereof are specified in said budget and approved by us. We shall not be responsible for any penalties incurred for late payments caused by your delay in submitting union contract forms, report forms or bills, unless we shall agree to pay said penalites, in which case, they shall be deemed part of the recording costs. We shall pay the recording costs of the Masters recorded at recording sessions conducted hereunder in accordance with the terms and provisions hereof in any amount not in excess of the recording budget therefor approved in writing by one of our officers.

(iii) All union contract forms and report forms for recording sessions hereunder, all bills pertaining to such recording sessions and all necessary payroll forms (including without limitation, all necessary W-4 and other withholding tax forms) pertaining to such recording sessions shall be submitted by you to us within seven (7) days after each recording session and in accordance with all applicable union requirements so that we shall be able to make all payroll payments without any penalty for late payment.

(iv)    In the event we shall otherwise be required to pay to you any additional advances for the completion of masters recorded hereunder, you shall, upon our demand, reimburse us in the amount thereof; in the event you shall fail to do so, we shall, in addition to any other rights or remedies which we may have in such event, have the right to deduct such amount from any monies, other than mechanicals, payable to you hereunder.

Whsp. 00066

07/02/86:PVB/jls:004

4.    All master recordings recorded by you during the term hereof, from the inception of the recording thereof, and all phonograph records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto, and all renewals and extensions thereof, shall be entirely our property, free of any claims whatsoever by you, or any other person, firm or corporation. We shall, accordingly, have the sole and exclusive right to copyright such master recordings, phonograph records or other reproductions, in our name, as the owner and author thereof, and to secure any and all renewals and extensions of such copyrights (it being understood that for such purposes, you and all other persons rendering services in connection with such master recordings shall be our employees for hire). Without limitation of any of the foregoing, we and/or our designees shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute and advertise phonograph records embodying such master recordings, to lease, license, convey or otherwise use or dispose of such master recordings by any method now or hereafter known, including sight and sound devices, in any field of use, to release phonograph records or other reproductions embodying such master recordings under the Solar, Constellation, Dick Griffey Productions, Elektra Records or a similar top-of-the-line label trademark, trade names or labels, to perform such phonograph records or other reproductions publicly, and to permit the public performance thereof by radio or television broadcast, or any other method now or hereafter known, all upon such terms and conditions as we may approve, and to permit any other person, firm or corporation to do any or all of the foregoing or we may refrain from doing any or all of the foregoing.

5.    We shall have the worldwide right in perpetuity to use and to permit others to use your name (both legal and professional, and whether presently or hereafter used by you), your likeness, other identification and biographical material concerning you, for purposes of trade in connection with such master recordings, the phonograph records derived therefrom, and our and/or our licensees' record business and products. Except with respect to prior recordings, we shall have the further right to refer to you during the term hereof by your legal or professional name as our exclusive recording artist and you shall in your activities in the entertainment field, use all reasonable efforts to be billed and advertised during the term hereof as our exclusive recording artist. The rights granted to us pursuant to this paragraph shall be exclusive during the term hereof and non-exclusive thereafter. Accordingly, but without limiting the generality of the foregoing, you shall not during the term hereof authorize or permit any person, firm or corporation other than us to use your legal or professional name or likeness in connection with the advertising or sale of phonograph records with the exception of phonograph records previously released.

(a)  Notwithstanding the foregoing, it is agreed that an authorized representative of Whispers Music, Inc. shall have the right to approve publicity photographs, biographical material and album artwork prior to the time any such material goes out as final copy. It is agreed that The Whispers or their representatives shall not unreasonably withhold their approval of artwork for albums, publicity photographs, or biographical material. It is agreed that Solar shall not have the obligation to obtain consent of The Whispers or their representative where their approval of the aforementioned materials are unreasonably withheld. It is agreed that for purposes of this subparagraph only the word "unreasonable" shall mean those instances where withholding of approval delays the marketing of Whispers' album or tapes, or where the cost of changing any such materials

07/02/86:PVB/jls:004

exceeds the cost normally or customarily expended for such items of material for The Whispers.

(b) Notwithstanding anything to the contrary contained herein, it is agreed that nothing herein shall convey to us so-called merchandising rights in The Whispers.

6.  Conditioned upon your material performance of all of the material terms and provisions hereof, you shall be paid in respect of the sale by us or our licensees of phonograph records embodying the Masters recorded hereunder and in respect of any other exploitation by us or our licensees of such Masters, the following royalties upon the terms and conditions hereinafter set forth:

(a)  (i)  In respect of long-playing records sold in the United States in the form of discs, and in respect of long-playing records sold by us in the United States and Canada in the form of prerecorded tapes (including reel-to-reel tapes, cartridges and cassettes), we shall pay you a royalty at the rate of fourteen percent (14%) of the suggested retail list price from time to time of such records. It is understood and agreed that for albums sold at a suggested retail list price of Eight Dollars and Ninety-eight cents ($8.98), the royalty rate set forth in this paragraph shall be the equivalent to the money as expressed in pennies of One Dollar and Ten Cents ($1.10).

(ii)  In respect of records sold by our licensees in the United States in the form of compact discs (CDs), tapes or other recorded devices, we shall pay you a royalty at the rate of seventy-five percent (75%) of the aforementioned royalty rate based upon the suggested retail list price from time to time of such records, it being expressly acknowledged that we currently do not license records in the form of compact discs or tapes, and

(iii)  In respect of 7 inch, 45 rpm single records, 12 inch "disco single" records, whether 33 1/3 rpm or 45 rpm, or so-called "extended play" records (the term "single record" as hereinafter used shall refer to one or more of such record configurations) sold by us in the United States and Canada in the form of discs or prerecorded tapes, we shall pay you a royalty at the rate of twelve percent (12%) of the suggested retail list price from time to time of such records.

(b)  In respect of records sold outside of the United States and Canada, we shall pay you a royalty at the rate of eighty percent (80%) of your otherwise applicable base royalty rate set forth in paragraphs 6(a)(i – iii) herein as we shall be accounted to or paid.

(c)  Notwithstanding any of the foregoing:

(i)  the royalty rate in respect of records sold through any direct mail or mail order distribution method (including without limitation, record club distribution) shall be one-half (½) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions;

(ii)  the royalty rate in respect of the sale of records on a mid-priced record line shall be three-fourths (3/4) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions and

Whsp. 00068

07/02/86:PVB/jls:004

the royalty rate in respect of the sale of records on a budget record line or low—priced record line shall be one—half (½) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions;

       (iii)  the royalty rate in respect of records sold for use as premiums or in connection with the sale, advertising, or promotion of any other product or service shall be one—half (½) of the otherwise applicable royalty rate as calculated in accordance with the foregoing provisions, and shall be based upon the price received by us for such records sold by us and upon the price utilized by our licensees in accounting to us for such records sold by our licensees;

       (iv)  the royalty rate in respect of records sold to the United States Government, its subdivisions, departments or agencies (including records sold for resale through military facilities), an in respect of records sold to educational institutions or libraries, shall be one—half (½) of the otherwise applicable royalty rate as calculated in accordance with the forgoing provisions; and

       (v)  in respect of Masters licensed by us:  (a) for phonograph record use on a flat—fee basis; (b) with respect to so—called compilation albums sold through retail stores in conjunction with special radio or television advertisements (including without limitation, records of the type presently distributed by K—Tel) on a royalty basis; (c) with respect to so—called "original soundtrack albums" on a flat—fee or royalty basis, and (d) for all other types of use (other than phonograph record use) on a flat—fee or royalty basis, the royalty rate shall be an amount equal to fifty percent (50%) of the net flat fee or net royalty, as the case may be, actually received by us in respect of each such use.

      (d)   Notwithstanding any of the foregoing, it is agreed that no royalties shall be payable on records:

       (i)  furnished as free and/or bonus to members or other participants in a record club distribution or special markets plan; or

       (ii)  given away for promotional purposes to disc jockeys, radio and television stations or networks or others; or

       (iii)  distributed as a sales inducement or otherwise and invoiced on a "no charge" basis to independent distributors, subdistributors, dealers and others ("Sales Inducement Records"); provided, however, that albums distributed hereunder as Sales Inducement Records shall only be distributed pursuant to special marketing programs of limited duration.

       (iv)  licensed or distributed for airline, background use or other transportation use ("Background Records") provided that if Solar is paid in connection with Background Records, Company's royalty account shall be credited with fifty percent (50%) of such net royalties paid to Solar which are reasonably allocable to a master(s) hereunder; or

       (v)  on records sold as scrap.

Whsp. 00069

07/02/86:PVB/jls:004

To the extent that records hereunder are distributed pursuant to this paragraph 6(d), such records shall not be deemed to be records constituting "net sales of records" hereunder;

(vi)    no royalties will be paid on sales made to anyone at prices fifty percent (50%) or more below the otherwise regular price to subdistributors ("Closeout Sales").

(d)    Notwithstanding any of the foregoing:

(i)    For purposes of computing royalties, there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder an amount equal to any excise, sales, value added, or comparable or similar taxes actually imposed and paid and included in the retail selling price.

(ii)    For purposes of computing royalties, there shall be deducted from the suggested retail list price (or other applicable price, if any, upon which royalties are calculated) of phonograph records hereunder, an amount equal to ten percent (10%) thereof for Single Records packaged in color or other special printed sleeves, twelve and one-half percent (12½%) for all longplaying records in disc form; and twenty percent (20%) thereof for reel-to-reel tapes, cartridges, cassettes, compact discs or other recorded devices (other than discs).

(iii)    Royalties shall be computed and paid upon eighty-five percent (85%) of one hundred percent (100%) of net sales for which payment has been received or credited against previously received advance; provided, however, that if any licensee distributing records hereunder through record clubs or other methods of mail order distribution shall compute and pay royalties to us in respect of such records on less than eighty-five percent (85%) of net sales, your royalties hereunder with respect to such records shall be computed and paid on the same percentage of sales as such licensee shall utilize in computing and paying to us royalties in respect of such records; and

(iv)    Records distributed in the United States by any of our affiliated branch wholesalers shall be deemed sold for the purposes of this contract only if sold by any such affiliated branch wholesaler to one of its independent third party customers.

(f)    Notwithstanding any of the foregoing:

(i)    The royalty payable to you hereunder with respect to any phonograph record embodying Masters hereunder coupled together with master recordings other than your Masters hereunder, shall be computed by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the number of royalty bearing masters contained on the Masters hereunder which are embodied on such phonograph record and the denominator of which shall be the total number of selections embodied on such phonograph record;

(ii)    The royalty payable to you hereunder and the recording costs hereunder with respect to any Master recorded hereunder by the Artist

Whsp. 00070

07/02/86:PVB/jls:004

jointly with any other artist or musician to whom we are obligated to pay a royalty in respect of such Master shall be computed by multiplying the otherwise applicable royalty rate and recording costs by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the sum of one (1) and the total number of such other artists or musicians whose performances are embodied thereon; provided that, without your prior consent, no Masters hereunder shall be recorded jointly with any such recording artist.

(g) Notwithstanding anything to the contrary contained hereunder, should Sound of Los Angeles Records (SOLAR) enter into a pressing and distribution relationship with any company during the term of this agreement, under which agreement Whispers albums and/or singles are manufactured and distributed, then all of the royalties payable in paragraphs 6(a)(i) and 6(a)(ii) shall be increased by one percent (1%) of the suggested retail list price.

7.    (a)    (i)    Statements as to royalties payable hereunder shall be sent by us to you on or before the 90th day following our receipt of any semi-annual accounting statements from our distributor with regard to the sale of records manufactured from the Masters recorded by you hereunder provided, however, we shall provide you with accounting statements no less frequently than semi-annually. Together therewith we shall remit to you payment of accrued royalties, if any, earned by you hereunder during such semi-annual period, less all recoupable advances and charges under this contract.

(ii)    We shall have the right to retain, as a reserve against charges incurred, credits or returns, such portion of payable royalties as shall be reasonable in our best business judgment. Notwithstanding the preceding sentence, if during the term hereof, our distributor shall withhold royalties against charges, credits or returns of the phonograph records hereunder (hereinafter sometimes referred to by the term "reserve") then we shall not have a right to retain from royalties payable to you any additional reserve, (e.g., a "double reserve") providing our distributor accounts separately to us as to any reserves being held against the royalties payable with respect to sales of phonograph records hereunder (as opposed to accounting to us on an overall basis as to any reserve being held against royalties payable with respect to sales of all records licensed by us to our distributor.) Notwithstanding the foregoing, it is agreed that any reserves held by us shall not exceed thirty-five percent (35%) with respect to albums or tapes and fifty percent (50%) with respect to single records. In any event, we agree that all reserves shall be reasonably liquidated no later than the fourth accounting period succeeding that in which they were initially retained.

(b)    No royalties shall be payable to you in respect of sales of records by any of our licensees until payment therefor has been received by us or credited to our account against previously received advances. Sales by any such licensees shall be deemed to have occurred in the semi-annual accounting period during which such licensees shall have rendered to us accounting statements for such sales.

(c)    Royalties in respect of the sale of records outside of the United States shall be computed in the national currency in which we are paid by our licensees, shall be credited to your royalty account hereunder at the same rate of exchange as we are paid, and shall be paid proportionately subject

Whsp. 00071

07/02/86:PVB/jls:004

to any transfer or comparable taxes which may be imposed and actually deducted upon our receipts. In the event we shall not receive payment in United States dollars in the United States in respect of any such sales, royalties in respect thereof shall not be credited to your royalty account hereunder. We shall, however, if we are able to do so and we shall use our best efforts with respect thereto, accept such payments in foreign currency and deposit in a foreign bank or other depository, at your expense, in such foreign currency, such portion thereof, if any, as shall equal the royalties which would have actually been payable to you hereunder in respect of such sales had such payments been made to us in United States dollars in the United States, and we shall notify you thereof promptly. We shall consult with you with respect to which foreign bank or other depository shall be utilized, but our inadvertent failure to do so shall not constitute our breach of this agreement. Deposit and notice as aforesaid shall fulfill our royalty obligations hereunder as to such record sales.

(d)    You shall be deemed to have consented to all royalty statements and all other accountings rendered by us hereunder and each such royalty statement or other accounting shall be conclusive, final and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by you to us within eighteen (18) months after the date rendered. No action, suit or proceeding of any nature in respect of any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action, suit or proceeding is commenced against us in a court of competent jurisdiction within two (2) years after the date rendered. Notwithstanding the foregoing, it is agreed that should we enter into a pressing and distribution deal during the term hereunder with a company during the term hereunder, under which agreement Whisper masters are distributed, then the time for objection set forth herein previously shall be extended from eighteen (18) months to two (2) years and the time for commencement of action shall be extended from two (2) years to two (2) years and four (4) months.

(e)    We shall maintain books of account concerning the sale and/or distribution of phonograph records hereunder. You, or a certified public accountant, in your behalf, may, at your sole expense, examine and make copies of our said books relating to the sale of your records hereunder (but excluding any of our books or records relating to the manufacture of records hereunder) solely for the purpose of verifying the accuracy thereof, only during our normal business hours and upon reasonable written notice. Our such books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered, and we shall have no obligation to permit you to so examine our such books relating to any particular royalty statement more than once. The rights hereinabove granted to you shall constitute your sole and exclusive rights to examine our books and records.

(i)    In the event we conduct an audit of our distributor, and such audit results in a benefit to you and/or your account, we agree to pass through to you your share of any such benefit.

(f)    With respect to any claim by you that additional monies are payable by us to you pursuant to this contract based upon an audit by you of our books and records, we shall not be deemed in breach of this contract unless within sixty (60) days after our receipt of your written claim that additional

07/02/86:PVB/jls:004

monies are due and payable together with a copy of the audit report prepared
in connection with such audit, sent by certified or registered mail, return receipt
requested, we shall neither: (1) pay such additional monies so claimed by you,
nor (2) contest such claim, in whole or in part. In the event we shall so contest
any such claim, we shall not be deemed in breach of this contract unless such
claim shall have been reduced to a final non-appealable judgment by a court
of competent jurisdiction and we shall have failed to pay you the amount thereof
within thirty (30) days after we shall have received notice of the entry of such
final non-appealable judgment.

(g)    All monies paid to you other than royalties payable pursuant
to this contract, shall constitute advances recoupable from any sums payable
under this contract, other than monies payable to you by virtue of mechanical
royalties, unless we otherwise consent in writing. Notwithstanding the foregoing,
it is agreed that no monies shall be recoupable against recording funds payable
to you hereunder if the sums recoupable deplete the actual recording fund
below, One Hundred Fifty Thousand Dollars ($150,000.00).

(h)    We shall have the right to deduct from any amounts payable
to you hereunder such portion thereof, if any, as may be required to be deducted
under the applicable provisions of the California Revenue and Taxation Code
or under any other applicable union or guild agreement, and you shall promptly
execute and deliver to us such forms and other documents as may be required
in connection therewith.

8.    (a)    Each selection recorded in any Master hereunder which
is written or composed by you, in whole or in part, alone or in collaboration
with others, or which is owned or controlled, in whole or in part, directly or
indirectly, by you or any person, firm or corporation in which you have a direct
or an indirect interest is hereinafter referred to as a "Controlled Composition".
Each Controlled Composition is hereby licensed to us for the United States
at the applicable copyright royalty rates set forth below on the basis of records
sold, less returns and credits, except that no copyright royalties shall be payable
in respect of any records for which no royalties are payable pursuant to paragraph
6 hereof. The applicable provisions of this contract, including but not limited
to, paragraphs 7 and 17 hereof, are hereby expressly incorporated into this
mechanical license.

(i).    For each Controlled Composition — seventy-five
percent (75%) of five cents (5¢). Notwithstanding the foregoing, in the event
that the United States' statutory copyright royalty rate is hereafter increased
so that it exceeds the statutory copyright royalty rate effective as of the
date hereof, then with respect to any Controlled Composition initially released
hereunder subsequent to the effective date of such increased statutory royalty
rate, the copyright royalty rate pursuant to this paragraph (a)(i) shall equal
such increased royalty rate (hereinafter the minimum statutory rate).

(ii)    Notwithstanding the foregoing, the maximum aggregate
copyright royalty rate payable by us in respect of any long-playing single-disc
record album hereunder, regardless of the number of selections contained
therein, shall be the product of seventy-five percent (75%) of ten (10) times
the minimum statutory royalty rate payable under the United States Copyright
Act for the compulsory license of a non-dramatic musical work, calculated

Whsp. 00073

at the rate per selection at the time such selection is initially released hereunder (such minimum statutory rate is hereinafter referred to as the "Minimum Statutory Rate"); and the maximum aggregate copyright royalty rate payable by us in respect of any single record hereunder, regardless of the number of selections contained therein, shall be two times the Minimum Statutory Rate described in paragraph 8 (a)(i) herein.  Accordingly, in the event we shall be required to pay in respect of any long-playing record album or and single record hereunder shall exceed the applicable maximum aggregate copyright royalty rate hereinabove specified, then the aggregate copyright royalty rate of the Controlled Compositions, if any, contained thereon, shall be reduced by an amount equal to such excess. If the actual aggregate copyright royalty rate which we shall be required to pay in respect of any such long-playing record album or single record, as the case may be, shall even as reduced in accordance with the immediately preceding sentence, still exceed the applicable maximum aggregate copyright royalty rate hereinabove specified, then we shall have the right, at our election, in addition to all other rights or remedies, which we may have in such event, to deduct an amount equal to the additional payments required to be made by us as a result thereof from any money or royalties payable to you hereunder.

(iii)    No copyright royalties shall be payable in respect of Controlled Compositions which are arrangements of selections in the public domain.  Notwithstanding anything to the contrary contained herein, in the event that any such arrangement has a new title or entirely different lyrics or a substantial additional of melodic material, then such arrangement shall be licensed to us at a copyright royalty rate to be calculated by taking the rate applicable with respect to an original Controlled Composition (set forth above) and multiplying such rate by the percentage utilized by the applicable performing rights society or organization (ASCAP or BMI) in determining the credits to be given to the publisher of such arrangement for public performances of the work; provided, however, that you shall furnish to us a copy of the letter from the applicable performing rights society or organization setting forth the percentage of the otherwise applicable credit which the publisher will receive for such public performances.  In the event you shall fail to provide us with such letter from such performing rights society organization, we shall not be obligated to pay any copyright royalty with respect to any such arrangement.

(iv)    Any assignment made of the ownership or copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms and provisions hereof.

(v)    Notwithstanding anything to the contrary contained hereunder, we agree not to cross-collateralize mechanical royalties against recoupment of other advances or payments made to you under this agreement. However, it is understood and agreed that any advances made to you hereunder on the basis of only mechanical royalties payment which may be due or payable shall be recoupable from any amount payable to you hereunder, including mechanical royalties.

9.    You hereby warrant, represent and agree that:

(a)    You are under no disability, restriction or prohibition, whether contractual or otherwise (i) with respect to your right to execute this contract, to grant the rights granted by you to us hereunder; and (ii) with respect to

Whsp. 00074

07/02/86:PVB/jls:004

your right to perform each and every term and provision hereof, and to record
each and every selection recorded by you hereunder. In this regard, you specifically
warrant and represent that no selection recorded by you hereunder is or shall
be subject to any re-recording or other restrictions pursuant to any other agreement
to which you are or have been party to by which you are otherwise bound.

(b)    During the term of this contract, you shall become and
remain a member in good standing of any appropriate labor union or unions
with which we may at any time have an agreement lawfully requiring such
union membership.

(c)    No Controlled Compositions nor any other selections, materials,
ideas or other properties furnished or embodied or contained in or used in connection
with the Masters or the packaging or advertising for phonograph records hereunder
will violate or infringe upon any common law or statutory right of any person,
firm or corporation, including without limitation, contractual rights, copyrights
and rights or privacy.

(d)    Our exercise of rights granted by you to us hereunder shall
not result in any liability to or be a violation of the rights of any person, firm
or corporation whatsoever. Moreover, we shall not be required to make any
payments of any nature for, or in connection with, the acquisition, exercise
or exploitation of any such rights except as specifically provided in this agreement.

10.    (a)    During the term of this contract, you shall not enter into
any agreement or make any commitment which would interfere with your
performance of any of the terms and provisions hereof nor shall you cause,
authorize or knowingly perform or render any services as an Artist of Masters
recorded hereunder, for the purposes of making phonograph records or master
recordings for any person, firm or corporation other than us. After the expiration
or termination of the term of this contract, you shall not prior to the latter
of the following dates perform for any person, firm or corporation other than
us, for the purpose of making phonograph records or master recordings, any
selection which shall have been recorded hereunder: (i) the date three (3)
years subsequent to the date on which such selection shall have been last recorded
hereunder, or (ii) the date two (2) years subsequent to the expiration or termination
of the term of this contract (such later date in respect of any such selection
being hereinafter sometimes referred to as the "Restriction Date").

(b)    You shall not at any time manufacture, distribute or sell
or authorize or knowingly permit the manufacture, distribution or sale by any
person, firm or corporation other than us of phonograph records embodying
(i) any performance rendered by you during the term of this contract, or (ii)
any performance rendered by you after the expiration or termination of the
term of this contract of a selection recorded hereunder if such performance
shall have been rendered prior to the Restriction Date applicable thereto.
Furthermore, you shall not record, authorize or knowingly permit to be recorded
for any purpose any such performance without in each case, taking reasonable
measures to prevent the manufacture, distribution or sale at any time by any
person, firm or corporation other than us of phonograph records embodying
such performance. Specifically, but without limiting the generality of the
foregoing, if during the term of this contract you cause, authorize or knowingly
perform for any such purpose any selection recorded hereunder prior to the

07/02/86:PVB/jls:004

Restriction Date applicable thereto, you will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used directly or indirectly for the purpose of making phonograph records. Upon our request, you shall promptly deliver a copy of the pertinent provisions of each such contract and you shall cooperate fully with us in any controversy which may arise or litigation which may be instituted relating to our rights pursuant to this paragraph. Without limiting the generality of the foregoing, we shall have the sole and exclusive right to utilize and exploit masters recorded hereunder for sight and sound devices and/or AV cassettes subject to the provisions of paragraph 21 hereunder. Notwithstanding the foregoing, nothing contained in this paragraph shall be construed to obligate us in any way to permit you to utilize or authorize any person or entity to utilize the Masters or AV cassettes, which permission we shall have the right to withhold or to grant as we shall, in our sole discretion, determine. Notwithstanding anything to the contrary contained herein, it is agreed that you shall have the right to perform dramatic roles in dramatic motion pictures, so long as any such dramatic role does not consist of singing and/or dancing. It is further agreed that should your dramatic performance as described herein be released as or in motion pictures, television or as home video devices, then such release will not violate our exclusive rights granted hereunder.

11.    You expressly acknowledge that your services hereunder are of a special, unique and intellectual character which gives them peculiar value and that in the event of a breach by you of any term, condition or covenant hereof, we will be caused irreparable injury.

12.    You hereby agree to and do hereby indemnify, save and hold us harmless from any and all damages, liabilities, costs, losses and expenses (including reasonable legal costs and attorneys' fees) arising out of or connected with any claim, demand or action by a third party which is based upon any breach of any of the warranties, representations or covenants made by you in this contract. You agree to reimburse us, on demand, for any payment made by us at any time with respect to any such damage, liability, cost, loss or expense to which the foregoing indemnity applies. We shall notify you of any such claim, demand or action promptly after we have been formally advised thereof. Pending the determination of any such claim, demand or action, we shall have the right, at our election, to withhold payment of any monies otherwise payable to you hereunder in an amount reasonably related to such claim and our estimated legal fee in connection therewith. In the event we do withhold monies which are due and payable to you hereunder, pending determination of a claim, we shall pay you interest on the principal of the difference between the amount withheld and expenses resulting from resolving any such claim. The interest rate at which we will pay you will be the savings account passbook rate at our bank. You shall have the right to post a bond in form, amount and duration and with a bonding company satisfactory to us, and in the event you shall post such a bond, we shall no longer withhold any monies due hereunder in respect of which such bond shall be posted.

13.    (a)    In the event you shall fail to fulfill your recording commitment for the initial term or any renewal term hereof at least one hundred twenty (120) days prior to the expiration of such term, then, unless we shall notify you to the contrary in writing, such term shall automatically be extended for a period of one hundred twenty (120) days from and after the date on which

07/02/86:PVB/jls:004

you shall have fulfilled your recording commitment therefor. Nothing contained in this subparagraph (a) shall in any way limit any of our other rights or remedies in connection with your failure to record Masters hereunder as and when required or to perform any of your other obligations hereunder. For purposes of this subparagraph (a), you shall be deemed to have fulfilled your recording commitment for any such term, only at such time as all such Masters comprising your recording commitment for such term, recorded in all material respects in accordance with the material terms and provisions hereof, shall have been recorded by your and delivered through your assistance to us.

(b)    We shall have the right, at our election, to suspend the running of the term of this contract and our obligation hereunder upon written notice to you if for any reason whatsoever your voice or ability to perform shall become impaired or if you shall refuse, neglect or be unable to comply with any of your material obligations hereunder, or if as a result of an act of God, fire, labor controversy, riot, civil commotion, act of public enemy, law enactment, rule, order or act of any government or governmental instrumentality, failure of technical facilities, failure or delay of transportation facilities, illness or incapacity or other cause of a similar or dissimilar nature not reasonably within our control or which we could not by reasonable diligence have avoided, we and/or our distributor are hampered in the recording, manufacture, distribution or sale of phonograph records. Such suspension shall be for the duration of . any such event or contingency and, unless we notify you to the contrary in writing, the term hereof (whether the initial term or any renewal term hereof) during which such event or contingency shall be commenced shall be automatically extended by such number of days as equals the total number of days of any such suspension. No such suspension shall exceed six (6) months unless caused by your refusal, neglect or inability to comply with your obligations hereunder, or by an event affecting a significant portion of the recording industry in the United States. During any such suspension, you shall not render services as a recording artist to any other person, firm or corporation.

(c)    In the event your voice or ability to perform shall become impaired or if you shall refuse, neglect or be unable to comply with any of your material obligations hereunder, including without limitation, your obligation to timely fulfill your recording commitment hereunder, then we shall have the right at our election, in addition to any other rights or remedies which we may have in such event, to terminate this contract upon written notice to you and shall thereby be relieved of any and all obligations hereunder except our obligations with respect to Masters recorded hereunder prior to such termination. For the purposes of this subparagraph (c) only, you shall be deemed to have timely fulfilled your recording commitment for the initial term or any renewal term hereof if all Masters comprising your recording commitment for such term, recorded in all respects in accordance with the terms and provisions hereof, shall have been delivered to us hereunder prior to the scheduled expiration of such term (i.e., without regard to any extension of such term pursuant to paragraph 13(a) hereof).

(d)    Notwithstanding the foregoing, if you do not fulfill any portion of your Recording Commitment within the time prescribed hereunder, we shall have the following options:

07/02/86:PVB/jls:004

(i)    to suspend our obligations to make payments and account to you under this agreement until you have cured the default;

(ii)    to terminate the term of this agreement at any time, provided that you have fully cured the default within a period of sixty (60) days after the date on which you have been notified that you have been placed on suspension; and

(iii)    to require you to repay to us the amount, not then recouped, of any advance previously paid to you by us and not specifically attributable to an Album which has actually been fully delivered.

(iv)    to decrease the amount of any monies owed to you as the recording fund for the album which immediately follows the late delivered album by an amount not to exceed twenty—five percent (25%) of the total amount of monies payable to you for any such fund.

We may exercise each of these options by sending you written notice.

(e)    Notwithstanding anything to the contrary contained herein, it is agreed that prior to exercising our rights as provided for in paragraph 13(d)(iv) hereunder, we shall be obligated to provide you with written notice that we intend to exercise our rights as described in said paragraph. Thereafter, you shall have a period of forty—five (45) days after receipt of said notice to satisfactorily deliver the album requested. Should you fail to deliver the requested album within a forty—five (45) day period after notice as described in this subparagraph, then we shall have the right to decrease amounts which may be payable to you hereunder as provided for in paragraph 13(d)(iv).

14.    You shall, upon our request, subject to your professional schedule and with your prior approval which shall not be unreasonably withheld, and which shall be given as promptly as is practical under the circumstances, but in no event longer than thirty (30) business days from the date of request, appear on dates and at film studios or other locations designated by us upon reasonable notice to you for the filming, taping or other permanent fixation of audio-visual reproductions of your performance.

15.    (a)    We shall have the right at our election, to assign any of our rights hereunder, in whole or in part, to any subsidiary, affiliated or related company; or to any person, firm or corporation owning or acquiring a substantial portion of our stock or assets and, to the extent of such assignment, we shall thereafter be relieved of our obligations hereunder, provided, however, that your albums and/or tapes continue to be distributed by a major record distributor.

17

Ex. 004-017                                                          Whsp. 00078

07/02/86:PVB/jls:004

(b)    Notwithstanding any of the foregoing to the contrary, you expressly acknowledge and agree this contract is subject to assignment to our distributor which is currently Elektra Records, and our distributor shall have the right to exercise, implement or enforce on our behalf any rights granted to us hereunder. In the event of a default or breach by us in performing any of our obligations under this contract, we shall not be deemed in breach of any of our obligations unless and until you shall send us specific written notice by certified or registered mail, return receipt requested, of the nature of such default, and simultaneously therewith, a duplicate notice, in the same manner, to our distributor at its principal place of business, and to its Vice President of Business Affairs, and we or our distributor shall have failed to cure such breach within thirty (30) days after our respective receipt of such notice.

(c)    You shall not have the right to assign any of your rights hereunder, unless you first obtain our prior written consent. Notwithstanding the foregoing, it is agreed that you shall have the right to assign any income which may be due and payable to you by virtue of this agreement.

16.    All notices to be given to you hereunder and all statements and payments to be sent to you hereunder shall be addressed to you at the address set forth on page 1 hereof or at such other address as you shall designate in writing and shall either be served by personal delivery (to an officer of our respective companies), certified or registered mail, return receipt requested, or telegraph, all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, mailed or delivered to a telegraph office, all charges prepaid except that notices of change of address shall be effective only after the actual receipt thereof.

(a)    All notices to be given to us hereunder shall be addressed to us at 1635 N. Cahuenga Boulevard, Hollywood, California 90028, Attention: Vice President of Business Affairs, or such other address as we shall designate in writing and shall be served by personal delivery, certified or registered mail, or telegraph, all charges prepaid. Except as otherwise provided herein, such notices shall be deemed given when personally delivered, or received.

17.    (a)    This contract sets forth the entire understanding of the parties hereto relating to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this contract, or any of the terms or provisions hereof shall be binding upon either of us unless confirmed by a written instrument signed by you or a duly authorized officer of your company and by a duly authorized officer of our company. No waiver by you or us of any term or provision of this contract, or of any default hereunder, shall affect your or our respective rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)    If any provision of this contract shall be held void, voidable, invalid or inoperative, no other provision of this contract shall be affected as a result thereof, and accordingly, the remaining provisions of this contract shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

18

Whsp. 00079

07/02/86:PVB/jls:004

(c)    Neither you nor we shall be deemed to be in breach or default in performing any of our respective obligations hereunder unless and until the other party shall have given to the defaulting party specific written notice by certified or registered mail, return receipt requested, of the nature of such breach or default and such defaulting party shall have failed to cure such breach within thirty (30) days after receipt of such written notice.

(d)    Nothing herein contained shall constitute a partnership or a joint venture between you and us. Neither party hereto shall hold itself out contrary to the terms of this paragraph and neither you nor we shall become liable for any representation, act or omission of the other contrary to the provisions hereof. This contract shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted by us in writing to such third party.

(e)    The provisions of any applicable collective bargaining agreement between us and any labor organization which are required by the terms of such agreement to be included in this contract shall be deemed incorporated herein as if such provisions were expressly set forth in this contract.

(f)    In the event of any action, suit or proceeding arising from or based upon this contract brought by either party hereto against the other, the prevailing party shall be entitled to recover from the other its reasonable attorneys' fees in connection therewith, in addition to the costs of such action, suit or proceeding.

(g)    Except as otherwise provided in this contract, all rights and remedies herein or otherwise shall be cumulative and none of them shall be in limitation of any other right or remedy.

(h)    This contact has been entered into in the State of California and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California.

18.    As used in this contract, the terms "record" "phonograph record" shall mean any device, whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, whether embodying sound alone, or sound synchronized with or accompanied by visual images, including without limitation, discs of any speed or size, reel-to-reel tapes, cartridges, cassettes or other prerecorded tapes; the term "master recording" shall mean any original recording of sound, whether embodying sound alone or sound synchronized with or accompanied by visual images, which may be used in the recording, production and/or manufacture of phonograph records, together with any derivatives thereof (other than phonograph records); the term "selection" shall mean a single musical composition, medley, poem, story or similar work; the term "recording costs" shall mean those costs and expenses incurred in connection with the recording of masters hereunder, including but not limited to, those costs and expenses referred to in paragraph 3(c) hereof and shall include the cost of making one reference record for masters recorded hereunder; the term "delivery to us", or words of similar connotation used in connection with master recordings or Masters shall mean delivery for mastering to a studio or other facility designated or approved by us, of fully mixed, leadered, sequenced

07/02/86:PVB/jls:004

and equalized 15 i.p.s. master tapes in proper form for the production of the parts necessary to manufacture phonograph records therefrom and delivery to us at our offices in Los Angeles, California of all consents, approvals, copy information, credits and other material required by us to release phonograph records embodying such master recordings and to manufacture album covers or other packaging therefor; the term "mid-priced record line" shall mean a record line or label, the records of which bear a suggested retail list price in the country in question in excess of sixty-six and two-thirds percent (66-2/3%) and less than eighty percent (80%) of the suggested retail list price in such country of top-line records on which recordings of the majority of our artists are initially released in such country; the term "budget record line" or "low priced record line" shall mean a record line or label, the records of which bear a suggested retail list price in the country in question which is sixty-six and two-thirds percent (66-2/3%) of top-line records on which recordings of the majority of our artists are initially released in such country; the term "net royalty" shall mean the gross royalty rate received by us from a licensee in respect of record sales, less an amount equal to any monies required to be paid by us in respect of such record sales in the form of contributions to the American Federation of Musicians Speciality Payments Trust Fund or Music Performance Trust Fund, or any similar fund, or in the form of mechanical royalties to the copyright proprietors (or their designees) of the musical compositions embodied in such records.  The term "advance" shall mean any monies payable to you hereunder other than monies payable to you as royalty payments for records which have already been sold and accounted for.  Except as provided hereunder, any advances paid or payable to you during the term of this agreement shall be fully recoupable from any other monies which may be due or payable to you hereunder.   The term "Compact Disc" shall mean a 120 MM diameter (or such other size) disc record primarily reproducing sound (whether or not with visual images), the signals of which are read and transmitted from disc by means of laser, such disc being commercially suitable in the opinion of SOLAR for release to the public.  The term "net sales" shall mean gross sales less returns and credits; the term "net sales" through normal distribution channels in the United States (of an LP) shall refer to net sales in the United States of top-line records of the particular LP through our customary distributors for resale through record or other retail store for which a royalty is payable hereunder.  Accordingly, and without limiting the generality of the foregoing, such term shall exclude records sold or distributed in the manner set forth in paragraph 6(c) hereof; and the term "our customary distributor" refers to each and every person, firm or corporation which we directly authorize to manufacture, distribute, sell and/or exploit the Masters and phonograph records hereunder.  The term you or yours as used hereunder shall mean both individually and collectively, Wallace Scott, Walter Scott, Nicholas Caldwell, Marcus Hutson, Leaveill Degree, p/k/a "The Whispers", "The Whispers" and Whispers Music, Inc.  The terms us or we as used hereunder shall mean Sound of Los Angeles Records, Dick Griffey and/or their affiliates.

19.    You hereby grant to us three (3) consecutive separate options, each to renew the term of this contract, for a period of twelve (12) months, each such renewal term to run consecutively beginning at the expiration of the immediately preceding term, all upon the same terms and conditions applicable to the initial term except as otherwise provided herein.  The renewal term option may be exercised only by giving you written notice of our election to exercise such option at any time prior to the commencement of the renewal

Whsp. 00081

term.  If we exercise our option to renew as provided herein, the renewal period
will begin immediately after the end of the current contract period, unless
such renewal term immediately follows a term which shall have been extended
pursuant to paragraph 13, in which event the option for such renewal term
may be exercised by us at any time on or before its commencement.

    (a)    During each renewal term hereof, if any, you shall provide
and deliver to us sufficient masters to constitute one (1) album, except as
expressly provided hereunder.

    (i)    Notwithstanding the foregoing, during the first option
period, you shall produce, record and deliver one additional master (herein
"the overcall LP") to constitute one album at our election.  We agree to notify
you in writing of our election to record "the overcall LP" during this period
within a period of six (6) months after your delivery of the first album delivered
during this option period.

    (b)    During the initial term:

    (i)    you shall produce and deliver the first album to be
recorded hereunder within the first four (4) months after the execution of
this agreement.

    (ii)    you will produce and deliver the subsequent albums
no sooner than six (6) months, nor longer than nine (9) months after the date
you deliver the last album delivered.

    (c)    During renewal terms:

    (i)    You shall produce and deliver the first album to be
recorded during the first option period within four (4) months after commencement
of that term;

    (ii)    You shall produce and deliver subsequent albums,
if any, recorded during the first renewal term no sooner than six (6) months,
nor no longer than nine (9) months after the date you deliver the last album
delivered hereunder.  Notwithstanding the foregoing contained herein, you
shall not be required to deliver "the overcall LP" prior to the date of four
(4) months after we exercise any overcall option right;

    (iii)    You will produce and deliver subsequent albums recorded
during each option period no sooner than six (6) months, no longer than nine
(9) months after the date you delivered the last album delivered hereunder.

    (d)    Notwithstanding the foregoing, it is understood and agreed
that no option renewal period shall end and no new period shall commence
until all albums required to be delivered during the then current contract period
have been delivered.

    20.    (a)    All monies paid to you or to or on behalf of The Whispers
to the extent you request SOLAR to pay monies to or on behalf of The Whispers
during the term of this agreement, shall constitute fully recoupable Advances
unless expressly agreed to the contrary in writing by SOLAR.  It is agreed
that SOLAR shall advance to you money for recording albums during the initial
term hereunder as follows:

(b)    The sum of Five Hundred Twenty-five Thousand Dollars ($525,000.00) shall be the fund for the first album to be recorded hereunder.

(i)  Notwithstanding the foregoing, you acknowledge that the otherwise payable Advance for the first album to be recorded hereunder was to be Five Hundred Twenty-five Thousand Dollars ($525,000.00).  However, you agree that you owed SOLAR the amount of One Hundred Seventy-five Thousand Dollars ($175,000.00) under the former agreement and you also agree that SOLAR shall have the right to recoup said One Hundred Seventy-five Thousand Dollars ($175,000.00) by reducing the recording fund of the first album to be recorded hereunder.  Therefore, the Advance payable to you for the first album to be recorded hereunder shall be Three Hundred Fifty Thousand Dollars ($350,000.00) payable as described in paragraph 20 (c-f) hereunder.

(c)    Upon the complete execution of this agreement we shall pay to you a recoupable advance of One Hundred Thousand Dollars ($100,000.00).

(d)    An additional Advance of Fifty Thousand Dollars ($50,000.00) shall be payable thirty (30) days after the date you are paid the advance described in paragraph 20(c) herein.

(e)    An additional advance of Fifty Thousand Dollars ($50,000.00) shall be payable thirty (30) days after payment of the advance described in paragraph 20 (d) hereunder.

(f)    A further advance of One Hundred Fifty Thousand Dollars ($150,000.00) payable as follows:

(i)    a fully recoupable advance of Seventy-five Thousand Dollars ($75,000.00) shall be payable to you upon commencement of recording.

(ii)    a fully recoupable advance of Seventy-five Thousand Dollars ($75,000.00) shall be payable to you within ten (10) days after your satisfactory delivery to SOLAR of the finished masters and all material in connection therewith along with satisfactory proof to SOLAR that all recording costs have been timely paid prior to such date.

(a) If in our reasonable judgement we believe that any portion of the recording cost are not paid or will not be paid we reserve the right to withhold any such amount from the final payment until you substantiate such cost can and/or will be paid.  Notwithstanding the foregoing, we agree to release any such amounts withheld provided you can demonstrate that any outstanding bills are paid or that they will be paid once we release the money withheld.

(g)    Notwithstanding the foregoing the following Advances shall be paid to you for subsequent albums recorded and delivered in the initial term hereunder:

(i)    for the second album, the sum of Four Hundred Twenty-five Thousand Dollars ($425,000).

07/02/86:PVB/jls:004

(ii)    for the third album, the sum of Three Hundred Twenty-five Thousand Dollars ($325,000.00).

(iii)   for the fourth album, the sum of Three Hundred Twenty-five Thousand Dollars ($325,000.00);

(h)    During each option period, you shall be paid the sum of Four Hundred Thousand Dollars ($400,000.00) for each album produced, recorded and delivered thereunder.

(i)    The Advances payable by virtue of paragraphs 20 (g)(i),(ii), (iii) and (h) hereunder shall be payable one-half (1/2) upon commencement of recording; and the balance within ~~fifteen~~ (15) days after satisfactory delivery of fully mixed, edited and mastered albums which are ready for the manufacture of commercial records along with satisfactory documentation that all recording cost have been timely paid. _& Any payments made pursuant to this sub-paragraph shall be subject to the provisions of Paragraph 20(f)(ii)(a) hereunder._

21.    From time to time during the term hereof, at our (hereinafter SOLAR's) request, you shall cause Artist to perform at sessions for the purposes of embodying Artist's performances on videotape and/or film ("Tapes").

(a)    SOLAR and Whispers Music, Inc. hereby agree that all Tapes produced hereunder shall be subject to the terms and conditions of this Paragraph.

(b)    You agree tht SOLAR is the sole, exclusive and perpetual owner of the Tapes from inception including, but not limited to, the sole, exclusive and perpetual owner of all copyrights of any nature whatsoever in and to the Tapes.

(c)    You consent to the exhibition and exploitation of the Tapes by SOLAR and its licensees and/or distributors for such purposes, at such times and places and in such media as determined by SOLAR, its licensees and/or distributors.

(d)    (i)    You agree that SOLAR and its licensees shall have the right to use all Owned or controlled Compositions embodied in Tapes with no further payment for the use of such Owned or controlled Compositions, provided that in the event that any Owned Composition is embodied on videograms distributed to the home video market, SOLAR, its licensees and/or distributors shall pay a mechanical royalty equal to four percent (4%) of the distributor price for each videogram actually sold in the USA and Canada by companies wholly-owned by SOLAR and a royalty of twelve and one-half percent (12½%) of SOLAR's net receipts on each videogram actually sold or rented in the USA and Canada by a non-SOLAR company or rented in the USA and Canada by any company. With respect to all sales of videograms outside the USA and Canada, a royalty will be negotiated in good faith between SOLAR's licensees and the applicable subpublisher or mechanical rights collecting society in the particular country.

(ii)    You agree to use your best efforts to cause the publisher of any non-Owned Composition embodied in a Tape hereunder to grant synchronization licenses at the rates specified in Paragraph 21(d)(i).

23

07/02/86:PVB/jls:004

(iii)  You agree to hold SOLAR harmless from rates in excess of those specified in this Paragraph 21(d).  If SOLAR pays any such excess, such excess payments shall be a direct debt from you to SOLAR which, in addition to any other remedies SOLAR may have, SOLAR may recover from royalties and/or any other payments to be made by SOLAR to Company.

(e)  (i)  With respect to the commercial exploitation of the Tapes by means of theatrical distribution, non–theatrical distribution (as that term is defined below), on television (including free, pay, subscription, cable and CATV) and any other commercial exploitation of the Tapes with the exception of the types of exploitation of the Tapes specified in Paragraph 21(g) hereinbelow, SOLAR agrees to pay you fifty percent (50%) of SOLAR's adjusted gross receipts (as that term is defined below).

(ii)  With respect to the exploitation of the Tapes, or any portion thereof, in generic television commercials (as defined herein), SOLAR agrees to pay you fifty percent (50%) of SOLAR's net revenues from such exploitation of the Tapes.  The Words "generic television commercial(s)" as used herein shall mean advertisements for radio stations, on television, using visual and/or audiovisual portions of the Tapes.

(f)  In the event that Tape(s) are combined with other tapes to create a videotape program ("Program"), all payments arising from the distribution and/or exploitation of the Tape(s) included in the Program (including, without limitation, payments to you, publishers of all selections embodied on the Tapes, video directors and audio producers) shall be calculated and paid from a pro–rata share of SOLAR's adjusted gross receipts from the Program ("Tape[s] Share").  The Tape(s) Share shall be determined by multiplying SOLAR's adjusted gross receipts from the Program by a fraction the numerator of which shall be the playing time of the Tape(s) and the denominator of which shall be the aggregate playing time of the portion of the Program, inclusive of the Tape(s).

(g)  In the event that SOLAR embodies any Tape(s) produced hereunder on videograms distributed to the home video market, you shall be paid a royalty of twelve and one–half percent (12½%) of the distributor price (less taxes) on sales of each videogram by SOLAR companies and fifty percent (50%) of SOLAR's net receipts from sales and rentals of such videograms by non–SOLAR companies.

(h)  SOLAR shall reduce your royalty arising from the distribution of videograms and all other forms of exploitation of the Tapes the amount of all royalties paid to third parties in connection with the distribution of videograms and all other forms of exploitation of Tapes, including, without limitation, audio producers, video directors, publishers and unions.

(i)  No royalties shall be payable to Company with respect to Tapes produced hereunder until such time as Company's liability Share (as hereafter defined) has been fully recouped pursuant to Paragraph 21(m) hereinbelow.

(j)  Except as otherwise expressly set forth herein to the contrary in this Paragraph 21, SOLAR's manufacture, distribution, sale, advertising,

    Whsp. 00085

07/02/86:PVB/jls:004

promotion, marketing and other exploitation of the Tapes and records derived therefrom shall at all times be subject to all of the other terms and conditions contained in this Agreement. SOLAR shall have the right to embody Tapes produced hereunder with videotapes embodying the performances of other artists.

(k)    In connection with the Tapes, SOLAR's sole royalty obligation to Company is to make the payments specified in this Paragraph 21.

(l)    For purposes of this Paragraph 21, the term "commercial exploitation" shall mean those uses of the Tapes for which SOLAR receives money which is allocated or is reasonably allocable to the Tapes produced hereunder, with the exception of the use provided for in Paragraph 21(g) hereof.

(m)    Notwithstanding anything in the foregoing to the contrary, SOLAR shall create an account ("Tape Account") which shall be (1) credited with all sums payable to Company under this Paragraph 21 or otherwise from the commercial exploitation of the Tapes ("Company's Revenue Share"); and (2) debited with one hundred percent (100%) of all Production Costs (as hereinafter defined) in connection with the Tapes ("Company's Liability Share"). Your Liability Share shall be fully recoupable from your Revenue Share. To the extent that your liability share is not recouped from Company's Revenue Share, then, fifty percent (50%) of your liability share shall be recoupable from any other royalties due or payable to you under this agreement other than mechanical royalties which may be due or payable.

(n)    The words "non-theatrical distribution" shall mean any use of the Tapes on airlines, ships at sea, or in institutions, churches, etc., but shall specifically exclude the types of exploitation of the Tapes specified in Paragraph 21(g) hereof.

(o)    The words "adjusted gross receipts" shall mean SOLAR's gross receipts relating to the exploitation of the Tapes with the exception of the exploitation set forth in Paragraph 21(g) hereof less (1) a distribution fee equal to thirty-five percent (35%) of SOLAR's gross receipts from such exploitation of the Tapes; or if higher, the distribution fee charged SOLAR by a subdistributor, licensee or distributor plus ten percent (10%).

(p)    The words "gross receipts" shall mean all sums and credits received by SOLAR from non-SOLAR companies in connection with the distribution of videograms to the home video market.

(q)    The words "net receipts" shall mean all sums and credits received by SOLAR from non-SOLAR companies in connection with the distribution of videograms to the home video market.

(r)    For the purpose of this Paragraph 21, production costs shall be deemed to include all costs incurred and/or paid by SOLAR in connection with the production of the Tape(s) including but not limited to (i) video master tape duplication costs; (ii) broadcast system transfer charges; (iii) shipping and freight charges; (iv) synchronization fees paid to publishers of selections embodied on the Tape(s); (v) assemblage costs; (vi) artwork costs; and (vii) all other payments to third parties exclusive of those payments specified in Paragraph 21(h) hereof.

Ex. 0044-25                                                                Whsp. 00086

07/02/86:PVB/jls:004

(s)    The word "videogram" shall mean videotape cassettes, videodiscs or similar or future devices on which the Tape(s) may be replicated for the Home Video Market as defined hereinafter.

(t)    The words "Home Video Market" shall mean the sale, lease or rental of videograms to individuals for private viewing in the home, and not for viewing at a place open to the public or any place where a substantial number of persons outside the social circle of the family or its acquaintances is gathered, or where admission charge is made or for viewing beyond the immediate place of exhibition, or for viewing over any television broadcast or transmission system.

(u)    In the event that videograms embodying Tapes are (i) distributed through record clubs owned and/or controlled by SOLAR companies; or (ii) embodied on budget videograms distributed by SOLAR companies; or (iii) embodied on EP videograms distributed by SOLAR companies; or (iv) distributed by SOLAR companies through special market plans, the otherwise applicable royalty rates arising from the distribution of videograms embodying Tapes by SOLAR companies shall be reduced by one-half (½).

(v)    For the purpose of this agreement the words "budget videogram" shall mean a videogram which bears a retail selling price at the date of release of three-fourths percent (3/4%) or less of the then current retail selling price for the substantial number of top line videograms in that category.

(w)    For purposes of this Agreement, the words "EP videogram" shall mean a videogram embodying thereon not less than three (3) nor more than five (5) selections.

(x)    SOLAR hereby approves the production of one (1) Tape hereunder in connection with the first single from each album to be delivered by you hereunder. We also hereby approve the budget of Forty-five Thousand Dollars ($45,000.00) for the production of video tapes produced hereunder.

22.    (a)    We shall, provided you are not at any time in breach of this contract, or any part hereof, release in the United States during the initial term and during the renewal term, if any, each LP embodying the performances of the artist which is recorded by you hereunder, within one hundred twenty days (120) after delivery to us of any such LP provided that we shall have available at the times required by us a sufficient number of newly recorded satisfactory masters, recorded in all respects in accordance with the terms and provisions hereof, to enable us to satisfy such release commitment.

(b)    In the event that during the initial term or any renewal term hereof, we shall fail to release in the United States any such LP pursuant to the provisions of this paragraph, your sole remedy shall be to notify us in writing, by certified or registered mail, return receipt requested, of such failure within thirty (30) days after the end of such one hundred twenty (120) day period and of your desire that this contract be terminated; if we do not, within ninety (90) days after our receipt of such notice from you, release in the United States such required minimum number of records. In the event we shall effect

Whsp. 00087

such release within such ninety (90) day period, we shall be deemed to have
released such required minimum number of records during the aforementioned
one hundred twenty (120) day period. In the event we shall fail to effect such
release within such ninety (90) day period, we shall have no liability whatsoever
to you in connection therewith and this contract shall terminate as of the
end of such ninety (90) day period.

23.    At any time during the term hereof, we shall have the right to
purchase, at our sole expense, any life, disability or health insurance policy
or policies naming you as the named insured for the term of this agreement
only. We shall have the unfettered right to select any insurance policy, the
beneficiaries thereof, and any terms thereof, including but not limited to,
the type of policy and the control over the administration of such policy.
You shall cooperate fully with us (as is more fully set forth in the following
sentence hereof) in obtaining such policy or policies. You shall take whatever
actions are required by the insurance company providing any such policy or
whatever actions are necessary in order for us to obtain and maintain in effect
any such policy, including but not limited to, at such times as we may request,
the submission to a thorough and complete physical examination by a licensed
physician and the completion of any and all documents or information necessary
or desirable to us or the applicable insurance company in connection with such
policy. You hereby acknowledge that you shall have no interest whatsoever
in any such insurance policy, and at our request, you shall acknowledge in writing
such lack of interest.

24.    This agreement is subject to assignment to Elektra Asylum Records
or our then current distributor (for the purposes of this paragraph only, the
term hereinafter referred to as Elektra shall be deemed to mean Elektra Asylum
Records or our current distributor), in accordance with the contract between
Sound of Los Angeles Records, Inc. (herein "Solar") and Elektra. Elektra shall
have the right to exercise, implement or enforce on Solar's or Elektra's behalf
any rights granted to Solar hereunder. In the event of a default or breach
by Solar in performing any of its obligations under this agreement, Solar shall
not be deemed in breach of any of its obligations unless and until you shall
send Solar specific written notice by certified or registered mail, return receipt
requested, of the nature of such default, and simultaneously therewith, a duplicate
notice in the same manner, to Elektra and Solar or Elektra shall have failed
to cure such breach within thirty (30) days after their respective receipt of
such notice.

25.    You warrant and represent without any condition or qualification
whatsoever that the minimum compensation which you will actually pay to
each individual comprising the Artist Group known as The Whispers in respect
of the services you furnish hereunder shall not be less than Six Thousand Dollars
($6,000.00) per annum. You acknowlege and confirm that this payment is
intended to preserve your and our right to seek injunctive relief to prevent
the breach of this contract by any individual comprising the Artist Group,
The Whispers, and accordingly, it is our mutual intention that this warranty
and representation be interpreted and construed in such a manner as to comply
with the provisions of California Civil Code Section 3423 (Fifth) concerning
the availability of injunctive relief to prevent the breach of a contract in writing
for the rendition or furnishing of personal services. If California Law is hereafter
amended to provide for a different minimum compensation requirement other

Ex. 0044027                                                                              Whsp. 00088

07/02/86:PVB/jls:004

than Six Thousand Dollars ($6,000.00) per annum as a requisite for injunctive
relief, the aforesaid references to Six Thousand Dollars ($6,000.00) shall automatically
be deemed amended to such new figure as of the effective date of such law.

(a)    Notwithstanding the foregoing in the event the Whispers
Music Inc. does not pay "The Whispers" as provided for in paragraph 26 hereunder
we guarantee to pay The Whispers as provided for therein. In such event any
amounts paid shall constitute non-refundable advances recoupable from any
and all monies payable to you hereunder.

*M.H. 7-7-8*

26.    In the event Wallace Scott or Walter Scott or Nicholas Caldwell
or Marcus Hutson and/or Leaveill Degree cease to be a member of the recording
group known as The Whispers, or for some reason should the group cease to
exist prior to the termination of this agreement, we shall have the irrevocable
option to cause you to furnish to us their exclusive services as a recording
artist for Dick Griffey Productions, Solar Records or its affiliates. Additionally,
each of The Whispers individually agree to be bound by the provisions of this
agreement should they cease to be a member of the group as described here-
under. Said option may be exercised by us no later than sixty (60) days after
you cease to be a member of The Whispers or the group disbands, whichever
may first occur.

*2-7-86*

*W. Scott
7-7-86*

(a)    If we exercise our option as provided herein, each leaving
member will be deemed to have executed an exclusive recording contract
with us pursuant to which such member agrees to furnish his exclusive recording
services to us upon the same terms and provisions as are delineated hereunder
with respect to your services, except that:

✳ (i)    The term of such agreement shall be for an initial
term of one (1) year, commencing as of the date of our written notice to you
and/or such member pursuant to this paragraph; and we shall have such number
of separate irrevocable options as equal the number of years in the term of
this contract or any extensions or renewals, but in no event shall the number
of options be less than three (3). Each option shall give us the right to renew
such term for one (1) year. Such renewal terms shall run consecutively, beginning
at the expiration of such initial term, all upon the same terms and provisions
applicable to such initial term. Each such renewal option may be exercised
only by us giving you written notice at least ten (10) days prior to the commencement
of the renewal term for which such renewal option is exercised;

(ii)    During the initial term, you and/or such Leaving
Member shall have the obligation to deliver to us, master recordings sufficient
to constitute no more than two (2) LP's, embodying your performances;

(iii)   During each renewal term, you and/or such Leaving
Member shall be obligated to deliver to us master recordings sufficient to
constitute no more than two (2) LP's;

(iv)   We shall pay to you and/or such Leaving Member
the following royalties and advances:

*N.C.
7-7-1986*

(1)    a basic Artist royalty rate pursuant to paragraph
6 hereunder of eight percent (8%) with such basic royalty being reduced, calculated

✳ superceding anything to the contrary contained in 28 paragraph 26)(a)(i) hereunder, it is agreed that
should we exercise our option as provided for in paragraph 26, then you shall have the obligation to
deliver one album to us during the initial term and each renewal term, plus one additional album *Whsp. 0008 and*
at our election in accordance with paragraph 18 (vii) _____

07/02/86:PVB/jls:004

and varied in the same manner and method as provided in paragraph 6 and under this agreement;

(2)    a fully recoupable Artist advance of Seventeen Thousand Five Hundred Dollars ($17,500.00) for each LP recorded.

27.    During the term of this agreement, we shall have the option to request that you perform as solo artist to perform masters embodying your performances. Should we elect to exercise this right, the provisions of paragraph 26 hereunder shall be applicable, including but not limited to, payment of advances, royalties, the term of the agreement as well as your recording obligations.

28.    Should we exercise our option under paragraph 26 hereunder, and we elect to record a video cassette or some other sight and sound device on masters recorded hereunder, fifty percent (50%) of any such amount expended for the production of the video or sight and sound device shall be fully recoupable against any solo artist royalties payable hereunder or from any royalties accrued which are attributable to commercial exploitation of the video, or sight and sound device and/or AV cassettes. Except as otherwise provided in this Paragraph 28, exploitation of video tapes shall be governed by the provisions of Paragraph 21 hereunder.

29.    You agree that for good and valuable consideration, you grant to Solar upon the expiration of this agreement the right to match any legitimate good faith offer you may obtain for your recording services from a legitimate recording company after you have shopped the marketplace and determined your new market value. You agree that you will enter into a new term recording agreement with Solar provided Solar is able to match the material terms of the best good faith offer you may have received.

30.    It is agreed that in the event that Dick Griffey shall cease active involvement in the direction of SOLAR for any reason other than death or disability, the Whispers Music, Inc. shall have the option upon sixty (60) days written notice to terminate this agreement.

31.    There will be no cross-collateralization of debt between the new and former agreements and separate accounting units will be established for each. The only sums recoupable from the former agreement against this new agreement shall be the sum of One Hundred Seventy-five Thousand Dollars ($175,000.00) as described in paragraph 20 hereunder.

32.    During the term of this agreement, SOLAR shall use its best efforts to make available to you weekly sales reports. Any inadvertent failure to provide such a weekly report shall not constitute a material breach of this agreement. However, you shall receive royalty statements together with any payments due on a semi-annual basis.

33.    SOLAR agrees to provide foreign tour support, if SOLAR requests that you tour overseas for the purpose of promotion, the cost will be non-recoupable. It is agreed and understood that you will need no less than seven (7) business class air tickets. All hotel accommodations shall be deluxe and each of the Whispers shall be paid a per diem of Fifty Dollars ($50.00) per day. In the event the Whispers tour overseas and it is not exclusively for promotion purposes,

07/02/86:PVB/jls:004

then fifty percent (50%) of all tour support expenses provided by SOLAR will be recoupable.

34.    SOLAR agrees to provide you with finished office space and will pay for all utilities and janitorial service to the space. SOLAR will negotiate a budget with you to cover the basic yearly cost of telephone usage with such budget to include two (2) lines for basic service and one (1) Watts line for long distance usage not to exceed Five Thousand Dollars ($5000.00) per year in costs during the term of this agreement. Notwithstanding the foregoing provisions of this agreement, it is agreed that only fifty percent (50%) of any sums advanced by SOLAR pursuant to this paragraph shall be recoupable from royalties otherwise due or payable to you hereunder.

35.    SOLAR agrees to consult with you on the selection and use of consultants to do independent promotion work on your product.

36.    SOLAR agrees to enter into a production agreement with two (2) new artists, to be mutually agreed upon by you and Dick Griffey. The recording fund for each LP by such artists shall be One Hundred Fifty Thousand Dollars ($150,000.00) and you shall be paid an all inclusive royalty rate of twelve percent (12%). Each artist deal will be a separate accounting unit. It is agreeable that the first new artist album project be the solo album of Walter and Wallace Scott. Notwithstanding the foregoing, it is agreed that we will negotiate the other terms of the new artist agreements no less than sixty (60) days after complete execution of this agreement.

37.    SOLAR guarantees release of all LP's delivered hereunder in the U.S. and Canada within four (4) months of the date of delivery. In the event more than six (6) months elapse after release of product in the U.S., and the product has not been released in the territories of the United Kingdom, France, Germany, Benelux, Japan, Australia or New Zealand (herein "the territories"), then you shall have the right to license the album in such territories where there has been no release, provided that you will pay to us an override equal to the difference between your domestic royalty rate and the royalty paid pursuant to the license agreement, but in no event should such override be less than two percent (2%) of royalties earned on net sales of albums or tapes sold by any such licensee. Notwithstanding the foregoing, it is understood and agreed the rights granted to you under this Paragraph 37 shall be subject to the following terms and conditions:

(a)    You must contact us in writing within thirty (30) days after the elapse of the six (6) month release guarantee period, in order to determine whether or not any given Whispers' album has been released in the aforementioned territory.

(b)    We must notify you in writing within seven (7) days after receipt of your request whether or not there has been a release of The Whispers album in the aforementioned territories. For purposes of this paragraph, an album will be deemed to have been released if it has been commercially released by SOLAR or it's licensee in the territories.

(c)    Within thirty (30) days after your receipt of our notice to you as described in sub-paragraph 37(b), you must submit to us a proposed

30

Whsp. 00091

07/02/86:PVB/jls:004

deal memorandum setting forth the material terms of the proposed deal as
well as a proposed contract. Notwithstanding the foregoing, it is understood
and agreed that each contract must be approved by us before any independent
deal can be made by you. We agree not to unreasonably withhold our approval,
however, we reserve the absolute right to approve the proposed company,
the term of the agreement, and the sell-off rights and termination provisions
for any proposed agreement.

    (d)    We agree to accept or reject the proposed agreement by
giving you written notice of our decision within fifteen (15) days after our
receipt of the deal memorandum and agreement described above.

    (i)    In the event that we approve the proposed agreement,
you have the right to enter into an agreement; however,

    (ii)    In the event that we do not approve the proposed agreement,
you have a period of fifteen (15) days after our rejection of your proposed
agreement to present in writing a new and acceptable deal. If the deal you
present during this fifteen day period is not acceptable, then your right to
independently license your album shall be lost.

    (e)    It is agreed that your rights under this paragraph shall
operate on each album to be recorded and delivered under the agreement.

    38.    (a)    You hereby warrant, represent The Whispers and agree
that you now have the exclusive right to the (Artist's) recording services under
a valid and binding recording contract (hereinafter referred to as the "Recording
Contract"), which Recording Contract grants to you all of the rights necessary
for the full performance of your obligations hereunder, that you shall continue
to have such exclusive right during the term hereof, that you shall not offer,
convey or deliver any Masters or other recordings featuring the Artist to any
party other than us and that you shall not release the Artist from any term
or provision of the Recording Contract, agree to any termination of the Recording
Contract, permit any such breach by the Artist or cause, authorize, or knowingly
permit the Artist to engage inb any activity which would hinder the Artist's
full and expeditious performance hereunder. You agree to cause the Artist
to execute, concurrently with the execution hereof, the letter of inducement
and adherence attached hereto. You agree to provide us with a true and correct
copy of said agreement prior to full execution of this agreement.

    (b)    You shall protect, implement, and enforce all of your rights
under the Recording Contract which are necessary for you to fulfill all of
your obligations hereunder. If you are unable to or do not in a timely manner
cure any default or breach under the Recording Contract, which such default
or breach in any way whatsoever adversely affects our rights hereunder, we
shall have the right, at our election, to cure such default on your behalf. You
shall, on our demand, promptly reimburse us for all expenses incurred or payments
made by us in connection with such cure, and in the event you shall fail to
so reimburse us, we shall have the right, in addition to any other rights or
remedies which we may have, to deduct an amount equal to any such expenses
or payments from any monies payable to you hereunder. Furthermore, in the
event we shall cure on your behalf any such default or breach, we shall have
the right, at our election and upon written notice to you and the Artist, to

Whsp. 00092

07/02/86:PVB/jls:004

cause to be assigned to us all of your rights under the Recording Contract
and to cause the Artist to perform directly for us all of your obligations hereunder.

  39. You agree that for good and valuable consideration, that you grant
to SOLAR upon the expiration of this agreement the right to match any legitimate
good faith offer you may obtain for your exclusive recording company after
you have shopped the marketplace and determined your new market value.
You agree that you will enter into a new term recording agreement with SOLAR
provided that we are able to match the material terms of the best good faith
offer you may have received.

Very truly yours,

for SOLAR RECORDS

W. Scott
7-7-86

ACCEPTED AND AGREED:

WHISPERS MUSIC INC.
an authorized representative

ACCEPTED AND AGREED:

Wallace Scott

Walter Scott

Nicholas Caldwell

Marcus Hutson

Leaveil Degree

p/k/a "The Whispers"

REC-7:006

Whsp. 00093

07/02/86.PVB/jls.004

EXHIBIT "A"    η. ℓ. 7-7-1986

THIS AGREEMENT dated April July 7, 1986, is entered into by and between Sound of Los Angeles Records (Solar) ("Company") and "The Whispers" ("Artist") with reference to the following facts:

A.    Company is currently party to an agreement (the "Artist Agreement") dated as of March 19, 1981, pursuant to which Artist is exclusively obligated to deliver to Company master recordings featuring the performances of The Whispers ("Artist").

B.    Pursuant to the Artist Agreement, Artist is currently obligated to deliver to Company four (4) additional albums featuring the performances of Artist.

C.    Artist is contractually free to enter into an agreement with another record company to furnish the recording services of Artist to another record company commencing upon the satisfaction of the obligations of Artist pursuant to the Artist Agreement.

D.    Prior to the date hereof, Artist had the right and opportunity to engage in extensive negotiations with record companies other than Company, and received offers from one or more of such other record companies to enter into agreements for the recording services of Artist to commence upon the expiration of the Artist Agreement.

E.    Notwithstanding the foregoing, Artist has elected freely and of their own volition to enter into this Agreement with Company following a careful analysis of the relative merits of the offers made by Company (as embodied herein) and such other record companies.

F.    Artist further acknowledges that Artist also has the right to elect not to enter into this agreement or an agreement with any other record company at this time, and that Company has not pressured Artist to enter into an agreement at this time. Notwithstanding this right, Artist has elected to enter into this agreement at this time because Artist believes that as a result of the success of the most recently released album featuring the performances of Artist entitled "So Good", Artist has substantial bargaining strength and that while such bargaining strength could be enhanced by the equal or greater success of the four (4) albums remaining to be delivered by Artist to Company

1

pursuant to the Artist Agreement, such bargaining strength could be diminished if such four (4) albums were not as successful as the album entitled "So Good" and Artist has unilaterally elected not to take the risk of such potentially diminished bargaining strength.

HEREBY AGREED AND ACKNOWLEDGED:

_____
Wallace Scott

_____
Walter Scott

_____
Nicholas Caldwell

_____
Marcus Hutson

_____
Leaveil Degree
p/k/a "The Whispers"

_____
Whispers Music Inc.
an authorized representative

REC-1.0:001

2

Ex. 004-034                                                                 Whsp. 00095

07/02/86:PVB/jls:004

Dated: _July 7, 1986_

_N. D._
_7-7-1946_

Whisper Music, Inc.
8033 Sunset Blvd.
Suite 404
Los Angeles, California 90046

Re:  AGREEMENT WITH WHISPERS MUSIC, INC.

Gentlemen:

_M.H. 7-7-8C_

Pursuant to an exclusive recording contract between the undersigned
and the above mentioned producer (hereinafter called "Producer"), Producer
is entitled to our exclusive services for the recording of phonograph records,
individually and collectively.  We have been advised that Producer is entering
into a written agreement with you (hereinafter called "Agreement"), pursuant
to which Producer has agreed to convey to you the masters of any and all recordings
which shall be made by us for Producer under our recording contract with
Producer, all upon terms and conditions which have been fully explained to
us.

_7-7-86_

In consideration of your executing the Agreement and as a further
inducement for you to do so (it being to our benefit as recording artists that
you execute same), we hereby agree as follows:

_W. Scott_
_7-7-86_

1.    We confirm, warrant, guarantee, covenant and agree that:

(a)    Producer has the right, insofar as we are concerned, to
enter into the Agreement and to assume all of the obligations, warranties
and undertakings to you on the part of Producer therein contained, and Producer
will continue to have such right during the term of the Agreement and there-
after until all said obligations, warranties and undertakings have been fully
performed and discharged.

(b)    All of the warranties, representations, covenants and agree-
ments on the part of Producer contained in the Agreement, which concern
us, are true and correct.

(c)    We will duly and to the best of our ability perform and
discharge all of the obligations and undertakings contained in the Agreement
insofar as the same are required of us and to the extent which Producer has
undertaken to procure our performance thereof.  Neither a breach by Producer
of our recording contract with Producer nor any proceeding in insolvency by
or against Producer shall in any way affect or alter any of our obligations
under this contract, including but not limited to our obligations under the preceding
sentence.

2.  If during the term of the Agreement or any extensions or renewals
thereof, Producer shall cease to be entitled to our recording services in ac-
cordance with the terms of the Agreement, or if Producer shall fail, refuse,
or neglect or be unable to duly perform and observe each and all of the terms

                                    Whsp. 00096

07/02/86:PVB/jls:004

and conditions of the Agreement required to be performed or observed by Producer, we shall, at your election, be deemed substituted parties to the Agreement in the place and stead of Producer and to have assumed and agreed to perform all of Producer's undertakings and obligations thereunder. Accordingly, we shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer had continued to be entitled to our recording services, and such rights, privileges and benefits shall be enforceable in your behalf against us, and you shall pay to us, for the recordings which we shall make for you, the royalty to which we are entitled under our recording contract with Producer.

3. You have the right to use and publish and to permit others to use and publish our names (both legal and professional and whether presently or hereafter used by any of us), likeness, other identification, and biographical material concerning us, for purposes of trade in connection with the master recordings recorded by us, the phonograph records derived therefrom, and your or your licensees' record business and products, and you have the right to refer to us as your exclusive artists. The rights granted herein shall be exclusive during the term of the Agreement or any extensions or renewals thereof and non-exclusive after the expiration or termination of the Agreement or any extensions or renewals thereof.

4. We shall not, during the term of the Agreement or any extensions or renewals thereof, perform for anyone other than you or Producer for the purpose of making phonograph records, and we shall not, after the expiration or termination of the Agreement or any extensions or renewals thereof, perform for anyone other than you, for the purpose of making phonograph records, any selection embodied in any recording which shall have been conveyed to you or to which you shall have been entitled under the Agreement prior to the later of the following dates: (i) the date five (5) years after such selection was last recorded or (ii) the date two (2) years after the expiration or termination of the term of the Agreement.

5. No termination of the Agreement shall operate to diminish our liability or obligation hereunder without your written consent, unless such termination shall occur as a result of your material breach of the Agreement or the natural expiration of the term of the Agreement.

6. You may, in your own name, institute any action or proceeding against us to enforce your rights under the Agreement and under this guarantee, or pursuant to our recording contract with Producer.

7. We shall look solely to Producer for any and all royalties, recording fees and other monies which shall be payable to us with respect to the making of all recordings under our recording contract with Producer and in connection with your manufacture and sale of records embodying said recordings and your exploitation of said recordings, all throughout the world, subject, however, to the provisions of paragraph 2 above. Should any dispute arise between any of us and Producer, you shall have the right, after your receipt of written notice of such dispute, to withhold the payment of all monies otherwise payable to Producer (or any of us) pursuant to the Agreement pending a determination of such dispute, such monies so withheld shall be reasonably related to the amount of controversy between any of us and Producer if the controversy involves, in your reasonable opinion, a distinct amount of money and does not

07/02/86:PVB/jls:004

involve a claim that either the Agreement or the agreement between us and
the Producer is terminated or void. No failure on your part to make any payment
to Producer (or us) by reason of such withholding shall constitute a breach
of the Agreement, or of this contract.

8. We hereby agree to render our services in connection with, and
to perform and observe, any and all terms and conditions required of Producer
pursuant to any amendment or modification of the Agreement hereunder entered
into by and between you and the Producer as if we were direct parties thereof.

9. As a material inducement for you to enter into the Agreement
with Producer, we shall grant you the right to purchase, at your sole expense,
at any time, during the term of the Agreement, any life, disability, or health
insurance policy or policies naming all or any of us as the named insured.
You shall have the unfettered right to select any insurance policy, the beneficiaries
thereof, and any terms thereof, including, but not limited to, the type of policy
and the amount and the issuer thereof, and you shall retain complete control
over the administration of such policy. We shall cooperate fully with you (as
is more fully set forth in the following sentence hereof) in obtaining such policy
or policies. We shall take whatever actions are required by the insurance company
providing any such policy or whatever actions are necessary in order for you
to obtain and maintain in effect any such policy, including but not limited
to, at such times as you may request, the submission by all of us or any of
us to a thorough and complete physical examination by a licensed physician
and the completion of any and all documents or information necessary or desirable
to you or the applicable insurance company in connection with any such policy.
We hereby acknowledge that we shall have no interest whatsoever in any insurance
policy and, at your request, we shall acknowledge in writing any such lack
of interest. In the event you shall not be able to obtain any such insurance
policy on any of our lives, as the result of the failure by one or more of us
to pass any aforesaid physical examination or to provide any information required
in connection with the application for or issuance of any such policy, you shall,
at any time prior to the date occurring ninety (90) days after the execution
of the Agreement, have the right to terminate the Agreement and in such
event we and/or the Producer shall, upon your demand, promptly reimburse
you for any monies (other than royalties) paid by you to the Producer pursuant
to the terms and conditions of the Agreement. In the event we and/or the
Producer shall fail to so reimburse you, you shall, in addition to any other
right and remedies you may have in such event, have the right to recoup any
such monies from any royalties payable by you to the Producer and/or us under
the Agreement or any other agreement between you and the Producer or you
and us.

10. In the event that for any reason whatsoever, Producer shall fail
to pay each of us a minimum compensation of Six Thousand Dollars ($6,000.00)
per annum, during the term of the Agreement solely in respect of the services
which we are hereby agreeing to render on your behalf, you agree, provided
that we are not in breach of the Agreement or of any of the terms and provisions
hereof to pay each of us an amount which when added to the amount (if any)
so paid to each of us by Producer shall equal Six Thousand Dollars ($6,000.00)
per annum during the term of the Agreement. Your such agreement shall
apply regardless of whether paragraph 2 of the within instrument becomes
applicable. We acknowledge and confirm that your such agreement is intended
to preserve the right to seek injunctive relief to prevent the breach by Producer

07/02/86:PVB/jls:004

and/or any of us of the Agreement and/or the within instrument. Accordingly, it is your and our mutual intention that your such agreement be interpreted and construed in such a manner as to comply with the provisions of California Civil Code Section 3423 (Fifth) concerning the availability of injunctive relief to prevent the injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services. If California law is hereafter amended to provide for a different minimum compensation requirement than Six Thousand Dollars ($6,000.00) per annum as a requisite for injunctive relief, the aforesaid references to Six Thousand Dollars ($6,000.00) shall automatically be deemed amended to such new figure as of the effective date of such law.

Very truly yours,

_____
WALTER SCOTT

AGREED TO:

SOLAR RECORDS, INC.

_____
DICK GRIFFEY, President

_____
WALLACE SCOTT

_____
NICHOLAS CALDWELL

AGREED TO:

WHISPER MUSIC, INC.

_____
MARCUS HUTSON

_____

_____
LEAVEIL DEGREE

p/k/a "The Whispers"

REC 8:004:6/11/86

Whsp. 00099

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

NOTICE TO COUNSEL
(For use in Direct Assignment of Civil Cases to Magistrate Judges Program only)

*The court has directed that the following rules be specifically called to your attention:*

    I.      Notice of Right to Consent to Disposition of a Civil Case by a United States Magistrate Judge
            [28 U.S.C. § 636(c) and General Order 11-06].

    II.     Continuing Obligation to Report Related Cases (Local Rule 83-1.3.3)

    III.   Service of Papers and Process (Local Rule 4)

**I.    NOTICE OF RIGHT TO CONSENT TO DISPOSITION OF A CIVIL CASE BY A UNITED
STATES MAGISTRATE**

*Pursuant to Local Rule 73-2, the initiating party must serve this notice and consent form CV-11C on each party at
the time of service of the summons and complaint or other initial pleading.*

This case has been randomly assigned to Magistrate Judge        Mumm
under the Direct Assignment of Civil Cases to Magistrate Judge Program in accordance with General Order
11-06. The case number on all documents filed with the court must read as follows:

CV13-8216

The parties are advised that their consent is required if the above assigned magistrate judge is to conduct all
further proceedings in the case, including trial and final entry of judgment pursuant to 28 U.S.C. § 636(c) and Federal
Rule of Civil Procedure 73. Should the parties not consent to proceed before the above assigned magistrate judge, the case
will be randomly reassigned to a district judge. If this occurs, the parties cannot later consent to reassignment of the case
to any other magistrate judge.

**The parties are further advised that they are free to withhold consent without adverse substantive
consequences. If the parties agree to the exercise of jurisdiction by the magistrate judge, the parties shall jointly or
separately file a statement of consent setting forth such election. Except as provided in Local Rule 73-2.4.1.1, for cases
originally filed in district court and initially assigned only to a magistrate judge, the statement of consent shall be
filed within 42 days after service of the summons and complaint upon that defendant, and within 42 days by plaintiff
after service upon the first-served defendant. If the United States, an agency of the United States, or an officer or
employee of the United States is a defendant, the statement of consent shall be filed by the government defendant
within 60 days after service of the summons and complaint upon that defendant.**

**For cases removed from state court and initially assigned only to a magistrate judge, a joint or separate
statements of consent shall be filed by plaintiff and all defendants upon whom service has been effected, within 14
days after the notice of removal is filed.**

Since magistrate judges do not handle felony criminal trials, civil trial dates are not at risk of being preempted by
a felony criminal trial, which normally has priority. Further, in some cases, the magistrate judge may be able to assign an
earlier trial date than a district judge. There may be other advantages or disadvantages which you will want to consider.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| Whispers Music Inc., <br> Walter Scott, Wallace Scott, <br> Nicholas Caldwell, Leavil Degree <br> _____ <br> *Plaintiff(s)* <br> v. <br> Unidisc Music, Inc. <br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) |

CV13-8216 FFM

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Unidisc Music, Inc.,  57-B Hymus Blvd. Pointe Claire, (Quebec) Canada, H9R 4T2

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Joseph E. Porter III
206 3rd Street
Seal Beach, CA 90740

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

NOV - 6 2013

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

1154

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify)*:



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*


                                                    _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Whispers Music Inc., Walter Scott, Wallace Scott, Nicholas Caldwell, Leavil Degree

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Unidisc Music, Inc.

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)**
JOSEPH E. PORTER III  SBN 51350
LAW OFFICES OF JOSEPH E. PORTER III
206 3RD STREET
SEAL BEACH, CA 90740

**(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $ Exceeds $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☒ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**    Case Number:    CV13-8216

CV-71 (09/13)                    CIVIL COVER SHEET                    Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? ☐ Yes ☒ No  If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? ☐ Yes ☒ No  If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _____   DATE: 11/1/13

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |